

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-26-2008

# Cooper v. SEPTA

Precedential or Non-Precedential: Precedential

Docket No. 07-1522

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Cooper v. SEPTA" (2008). *2008 Decisions.* Paper 176.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/176

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-1522

_____

ALLISON COOPER,
ON BEHALF OF HERSELF
AND ALL OTHERS SIMILARLY SITUATED

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY,
                                                    Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 06-cv-0888
(Honorable Thomas M. Golden)

_____

Argued March 4, 2008
Before:  SCIRICA, *Chief Judge*,
FISHER and ROTH, *Circuit Judges*.

(Filed: November 26, 2008)

THOMAS S. BIEMER, ESQUIRE (ARGUED)
STEVEN B. GOODMAN, ESQUIRE
MARIANA ROSSMAN, ESQUIRE
Dilworth Paxson
3200 Mellon Bank Center
1735 Market Street
Philadelphia, Pennsylvania 19103

MICHAEL G. TIERCE, ESQUIRE
JO BENNETT, ESQUIRE
Stevens & Lee
1818 Market Street, Suite 2900
Philadelphia, Pennsylvania 19103
        Attorneys for Appellant

JORDAN M. LEWIS, ESQUIRE (ARGUED)
Siegel, Brill, Greupner, Duffy & Foster
1300 Washington Square
100 Washington Avenue South
Minneapolis, Minnesota 55401

PATRICIA V. PIERCE, ESQUIRE
HANNAH SCHWARZSCHILD, ESQUIRE
Willig, Williams & Davidson
1845 Walnut Street, 24th Floor
Philadelphia, Pennsylvania 19103

Attorneys for Appellee,
Allison Cooper

LAWRENCE A. KATZ, ESQUIRE
Coffey & Kaye
Two Bala Plaza, Suite 718
Bala Cynwyd, Pennsylvania 19004
    Attorney for Amici Curiae-Appellee,
    United Transportation Union,
    Brotherhood of Railroad Signalmen,
    Brotherhood of Locomotive Engineers and Trainmen

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

At issue is whether the Southeastern Pennsylvania Transportation Authority ("SEPTA") is entitled to sovereign immunity under the Eleventh Amendment. In 1991, we determined SEPTA was not an arm of the state. *Bolden v. SEPTA*, 953 F.2d 807 (3d Cir. 1991) (en banc), *cert. denied*, 504 U.S. 943 (1992). Now SEPTA contends that subsequent changes in Eleventh Amendment jurisprudence and in SEPTA's state funding formula demand reconsideration and entitle it to sovereign immunity. The District Court disagreed. We will affirm.

3

Plaintiff Allison Cooper, a bus driver for SEPTA, brought a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a). She contends SEPTA undercompensates its bus drivers by failing to fully account for their performance of required pre-trip safety inspections. SEPTA filed a motion to dismiss citing the Eleventh Amendment bar of sovereign immunity. After allowing discovery on SEPTA's funding, the District Court construed the motion as one for summary judgment and denied it. SEPTA appealed.

**I.**

SEPTA, a metropolitan transportation authority created by the Commonwealth of Pennsylvania,[1] operates a mass-transit system within Philadelphia and its surrounding counties, as well as points in New Jersey. The pay period for SEPTA's bus drivers commences ten minutes before the bus is scheduled to pull out of the depot in the morning. Those who drive a "swing run" – two shifts a day, with a break in between – are compensated for the second shift commencing at the time of the scheduled pull-out in the afternoon. The bus drivers must perform a safety inspection before any departure, whether in the morning or afternoon. According to Cooper, these inspections take ten to thirty minutes to complete.

Cooper filed this collective action, bringing claims under

---

[1]*See* 74 Pa. Cons. Stat. §§ 1701–1785.

the FLSA, 29 U.S.C. § 207(a), as well as under state law.[2] She contended SEPTA deprived its bus drivers of compensation by paying them for only a portion of the time it took to perform morning inspections and by failing to pay them at all for

[2]Count 1 asserted "SEPTA has willfully and intentionally engaged in ongoing and knowing violations of the overtime provisions of the FLSA by requiring plaintiff and all others similarly situated to conduct pre-trip inspections before their runs, but not paying them for all time worked performing the pre-trip inspections, and not counting the inspection time for purposes of calculating overtime." Compl. ¶ 40. Count 1 was brought as a collective action on behalf of "those bus drivers who, without factoring in the time spent performing pre-trip inspection, were already working at least 40 hours a week." *Id.* ¶ 38. Count 2 set forth two classes – a "swing shift class" and a "morning pre-trip class" – and contended SEPTA's conduct was prescribed by state statute and breached its collective bargaining agreement. Counts 3-5 adopted these two classes and asserted various other claims under state law.

Subsequent to filing her complaint, Cooper "narrowed her lawsuit to a single claim and now asserts a single class, brought under the FLSA. The class consists of all SEPTA 'swing run' bus drivers (defined as all drivers who work two shifts in a day, with lengths of varying breaks between their runs) who work at least 40 hours a week but who are not paid for their required afternoon pretrip vehicle inspections." Cooper's Mem. in Support of Motion to Certify 4.

inspections before the second shift of a swing run. Proceedings in the District Court were stayed pending the outcome of this appeal.[3]

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331. An order denying Eleventh Amendment immunity is immediately appealable as a final order under the collateral order doctrine. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-45 (1993). Accordingly, we have jurisdiction under 28 U.S.C. § 1291. Our review of a denial of summary judgment is plenary. *Hampe v. Butler*, 364 F.3d 90, 93 (3d Cir. 2004). "The party asserting immunity bears the burden of production and persuasion." *Febres v. Camden Bd. of Educ.*,

---

[3]On July 18, 2007, after briefing but before oral argument, the General Assembly enacted Act 44, 74 Pa. Cons. Stat. §§ 1501–1520. Act 44 replaced the provisions contained in Chapter 13 of Title 74 (§§ 1301–1315), which pertained to "Public Transportation Assistance" and (with the exception of § 1315) were enacted as part of Act 26 of 1991 ("Act 26"). As discussed *infra*, Act 26's provisions created a dedicated source of funding for public transportation throughout the state and imposed certain requirements on the entities applying for this funding. Act 44 repealed the provisions in Chapter 13, implemented a new source of funding, and established a new financing scheme for entities applying for and receiving funding.

445 F.3d 227, 229 (3d Cir. 2006).

## III.

Since our decision in *Bolden*, the Supreme Court has refined its Eleventh Amendment jurisprudence. We have followed suit. SEPTA contends these changes have wrought a "fundamental shift in emphasis," so that a state's characterization of an agency as an arm of the state is essentially dispositive. SEPTA's Reply Br. 8. We have modified our own jurisprudence to reflect direction from the Supreme Court, but we have not concluded that a state's characterization warrants dispositive treatment in our sovereign immunity analysis.

A brief review of *Bolden* and subsequent case law is in order. In *Bolden*, we addressed en banc whether SEPTA was entitled to sovereign immunity. We applied the test set forth in our analysis of New Jersey Transit's claim of immunity in *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) (en banc). This test determines whether an agency is entitled to sovereign immunity by balancing three factors: (1) state treasury, (2) status under state law, and (3) autonomy.[4] Noting that the state-treasury factor was "the

---

[4]In *Urbano v. Board of Managers of the New Jersey State Prison*, we identified nine factors to consider when determining whether an entity is the "alter ego" of the state, and thus entitled to sovereign immunity. 415 F.2d 247, 250-51 (3d Cir. 1969). In *Fitchik*, we realigned the *Urbano* factors into three larger

7

'most important'" of the three, *Bolden*, 953 F.2d at 818 (quoting *Fitchik*, 873 F.2d at 659), we first addressed the Commonwealth's funding of SEPTA. With "only about 27% of its revenue [coming] from the state government," SEPTA did

---

questions, while eliminating one of the nine factors – "whether the agency exercises a governmental or proprietary function" – because it was no longer relevant in light of *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985). *Fitchik*, 873 F.2d at 659 & n.2. The three "*Fitchik* factors" are:

> (1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors – whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);
> (2) The status of the agency under state law (this includes four factors – how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and
> (3) What degree of autonomy the agency has.

*Id.* at 659. We stipulated that "[a]lthough no single *Urbano* factor is dispositive, the most important is whether any judgment would be paid from the state treasury." *Id*.

8

not derive its funding primarily from the Commonwealth. *Id*. at 819. "[T]his most important fact" weighed heavily against a finding of immunity. *Id*. Furthermore, the Commonwealth was shielded from liability for SEPTA's obligations. *Id*. Nor was SEPTA required to request funds from the Commonwealth to pay for adverse judgments because it could raise revenues by increasing fares. *Id*. And even though SEPTA contended it might not be able to meet a significant shortfall by raising fares and would be forced to rely on increased state subsidies, we rejected that argument. We found "discretionary subsidies committed in reaction to a judgment . . . would not necessarily transform the recipients into alter egos of the state." *Id*. Given this funding relationship between SEPTA and the Commonwealth, we found the state-treasury factor "weigh[ed] at least as strongly against SEPTA's Eleventh Amendment argument as it did against New Jersey Transit's argument in *Fitchik*." *Id*. at 820.[5]

We then considered the second factor – SEPTA's status

---

[5]SEPTA also relied on Act 26, which created a "Public Transportation Assistance Fund" that provided for the Commonwealth to make an annual appropriation to meet certain public transportation needs. *Bolden*, 953 F.2d at 819 (citing Act 26, 74 Pa. Cons. Stat. §§ 1302(2)(iii) & (3), 1303(a) (repealed 2007), § 1314 (repealed 1994)). Because Act 26 had just been enacted, we found its impact "too uncertain to be given significant weight" in our determination. *Id*. at 819-20.

9

under state law. We found some of SEPTA's attributes were not characteristic of an arm of the state: it had (1) a "separate corporate existence," (2) "the power to sue and be sued," and (3) "the power to enter into contracts and make purchases on [its] own behalf." *Id*. But we also found attributes of SEPTA that were characteristic of an arm of the state: (1) it was "exempt[] from state property taxation," (2) it possessed "certain public powers such as the power of eminent domain," and (3) it was "subject to the Pennsylvania Sovereign Immunity statute." *Id*. SEPTA shared all of these attributes with New Jersey Transit. We noted "SEPTA differ[ed] from [New Jersey Transit] in that SEPTA [was] proclaimed by statute to be 'an agency and instrumentality' of the Commonwealth, but this same provision also describe[d] SEPTA as a 'separate body corporate and public.'" *Id.* (quoting 55 Pa. Cons. Stat. Ann. § 600.303(a) (West 1991) (repealed 1991); Act 26, 74 Pa. Cons. Stat. § 1502 (repealed 1994)). Thus, we found SEPTA's status under state law, like that of New Jersey Transit in *Fitchik*, weighed only "'slightly' in favor" of sovereign immunity. *Id.*

Third, we considered SEPTA's degree of autonomy from the Commonwealth. Although in *Fitchik* this factor weighed slightly in favor of according New Jersey Transit immunity, we found SEPTA enjoyed more autonomy than New Jersey Transit. SEPTA possessed powers similar to New Jersey Transit's, which gave the entities "a measure of autonomy." *Id*. These powers included "the exclusive power to initiate action and the power 'to enter contracts, bring lawsuits, purchase and sell

10

property, buy insurance, structure the corporation's internal management, and set and collect fares.'" *Id*. (quoting *Fitchik*, 873 F.2d at 663). Only five of SEPTA's fifteen board members were appointed by state officials, with the other ten appointed by the counties SEPTA served, whereas three of New Jersey Transit's seven board members were (by statute) members of the state's executive branch. *Id*. Significantly, New Jersey's Governor could veto the actions of New Jersey Transit's board, but SEPTA was not subject to the Commonwealth's gubernatorial veto. *Id.* Because SEPTA had greater control over its own actions, we found "the autonomy factor, which weighed 'slightly' in [New Jersey Transit's] favor, is appreciably weaker here." *Id*.

We considered these three factors, treating the state-treasury factor as the most important. *Id*. at 821. Finding SEPTA's argument for immunity weaker than New Jersey Transit's, we held SEPTA, like New Jersey Transit, was not entitled to Eleventh Amendment protection. *Id*.

Supreme Court jurisprudence since *Bolden* has prompted us to alter our sovereign immunity analysis. In *Hess v. Port Authority Trans-Hudson Corp.*, the Court held PATH, a subsidiary of the Port Authority, was not an arm of the state entitled to sovereign immunity. 513 U.S. 30, 52-53 (1994). In its analysis, the Court recognized "the States' solvency and dignity" as "the concerns . . . that underpin the Eleventh Amendment." *Id.* at 52; *see also id.* at 47 (describing these concerns as "the Eleventh Amendment's twin reasons for

11

being"). Drawing on *Hess*, the Court in *Regents of the University of California v. Doe* found the University of California retained sovereign immunity despite the federal government's agreement to indemnify it against costs of litigation, including adverse judgments. 519 U.S. 425, 431 (1997). The Court clarified that, when assessing whether an entity is an arm of the state, "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Id*.; *see also id.* (refusing "to convert the inquiry into a formalistic question of ultimate financial liability").

In *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743 (2002), the Supreme Court considered whether sovereign immunity applied to administrative adjudications conducted by the Federal Maritime Commission ("FMC"). In finding sovereign immunity prohibited the FMC from adjudicating complaints filed by private parties against non-consenting states, the Court said "[t]he preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Id*. at 760; *see also id*. at 765 ("While state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens, the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns." (internal quotation marks and citations

12

omitted)).

In light of *Doe* and *FMC*, we held that "we can no longer ascribe primacy to the [state-treasury] factor" in our sovereign immunity analysis. *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239 (3d Cir. 2005). We still consider all three factors relevant in assessing whether an entity warrants Eleventh Amendment protection, but none is predominant. *Id*. at 240. SEPTA contends *Benn* "essentially relegated the 'state treasury factor' to a non-factor." SEPTA's Br. 19 n.8. Under this view, the District Court erred by giving equal consideration to each factor because, as SEPTA argues, "[w]hile the District Court's analysis may be appropriate where the status of an entity is uncertain under state law, given SEPTA's clear status as a Commonwealth agency, the District Court's approach effectively ignores the Supreme Court's mandate that protection of a State's dignity interests require [sic] giving greater credence to the State's intentions and the manner in which the State has structured the entity." *Id*. at 20. SEPTA contends our recent case law demonstrates that "the State's characterization and treatment of [an] entity" merits "substantial, if not dispositive" weight in our analysis. *Id*. at 21. But in the cases SEPTA cites as support, we gave equal consideration to each of the three *Fitchik* factors. *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 546 (3d Cir. 2007) ("[E]ach of the factors must be considered equally in this case . . . ."); *Febres*, 445 F.3d at 229 ("We now accord equal consideration to all three prongs of the analysis . . . ." (citing *Benn*, 426 F.3d at 239-40)). In *Benn*, we

13

addressed whether the First Judicial District of Pennsylvania (Philadelphia's state court system) was entitled to sovereign immunity. We noted the funding scheme for this judicial system placed "considerable financial responsibility" on the local counties rather than the state. *Benn*, 426 F.3d at 240. But more significant was the judicial system's status under state law and its lack of autonomy from the Pennsylvania Supreme Court. Therefore, we concluded "the *Fitchik* factors strongly favor Eleventh Amendment immunity." *Id.* In *Febres*, we found two of the three factors – treasury and status – suggested the Camden Board of Education was not entitled to immunity, while the autonomy factor slightly favored a finding of immunity. 445 F.3d at 237. With two factors counseling against immunity, we held the Board was not an arm of the state. *Id*. In *Bowers*, we found the University of Iowa was entitled to sovereign immunity even though the state was not obligated to pay a judgment against the University. 475 F.3d at 549-50. Because the state-treasury factor weighed only slightly against immunity and the status and autonomy factors weighed heavily in favor of it, we held the University was entitled to immunity. *Id.*

As set forth in these post-*Bolden* cases, our inquiry into sovereign immunity is not merely "a formalistic question of ultimate financial liability." *Doe*, 519 U.S. at 431. We recognize and consider the state-treasury factor on the same terms as the other two *Fitchik* factors. It has not been reduced to a "non-factor," nor has the status factor become independently "dispositive" of our sovereign immunity inquiry.

14

*See Benn*, 426 F.3d at 240 ("The relegation of financial liability to the status of one factor co-equal with others in the immunity analysis does not mean that it is to be ignored. Like the other two factors referred to in *Fitchik*, it is simply to be considered as an indicator of the relationship between the State and the entity at issue."). Our approach is consistent with Supreme Court precedent following *Bolden*. As noted, the Court has stressed the centrality of state dignity to the Eleventh Amendment. But state dignity does not preclude consideration of an entity's financial relationship with the state and its degree of autonomy. *See, e.g.*, *Fed. Maritime Comm'n*, 535 U.S. at 765 (recognizing that "accord[ing] the States the respect owed them as joint sovereigns" is the "central purpose" of Eleventh Amendment immunity, and that "shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens" is an "important function" served by that doctrine (internal quotation marks omitted)). State dignity encompasses all three factors – we give them equal consideration, and how heavily each factor ultimately weighs in our analysis depends on the facts of the given case. Accordingly, we will apply the approach set forth in *Benn*, *Febres*, and *Bowers* here to reexamine each factor in light of the changes – both in the case law and in the funding structure of SEPTA – since *Bolden*. Though our method of balancing the factors has changed, our analysis of each individual factor in *Bolden* remains instructive.

15

**IV.**

A. *State Treasury*

As previously noted, the first factor asks "[w]hether the money that would pay the judgment would come from the state," which includes considering "whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts." *Fitchik*, 873 F.2d at 659. We emphasized in *Bolden* the percentage of funding SEPTA received from the Commonwealth as the "most important fact" in this inquiry. 953 F.2d at 819. Accordingly, in determining the state-treasury factor weighed against a finding of immunity for SEPTA, we considered it very significant that SEPTA received only 27% of its revenues from the Commonwealth. *Id.*

Since *Bolden*, the amount of funding SEPTA receives from the Commonwealth has increased, although the precise amount is in dispute. SEPTA contends state subsidies constitute over half of its annual operating expenses.[6] Cooper responds that state funding constitutes 35% of these annual operating expenses. This disparity is explained by how the Commonwealth's contribution is calculated. Both parties rely on the affidavit of Richard G. Burnfield, the Senior Director of

---

[6]According to SEPTA, state subsidies constituted a 51% share in 2005 and a 52% share in 2006.

16

Budgets for SEPTA. In his affidavit, he said:

> For fiscal year 2006, $494,844,000 is budgeted to
> come from the Commonwealth for SEPTA's
> operating expenses. This budgeted amount
> includes $333,144,000 in operating subsidy,
> which includes direct payments to SEPTA's
> bondholders, through the Pennsylvania
> [Transportation] Assistance Fund, set up pursuant
> to the Public Transportation Assistance
> [provisions of Act 26]. It also includes $92.1
> million in "flexed" highway funding. Also
> included is $52.3 million from the
> Commonwealth in a senior subsidy, and $17.3
> million in the shared ride subsidy.

SEPTA considers all $494.8 million to be state funding, while
Cooper contends only the operating subsidy, amounting to
approximately $333.1 million, constitutes state funding. Cooper
cites SEPTA's 2006 budget, which defines "subsidy" as
"[f]unds received from another source that are used to cover the
cost of a service or program that is not self-supporting."[7]

---

[7]Cooper contends SEPTA's numbers are wrong for two
reasons. First, the $92.1 million in "Flexible Highway funds" is
provided by the federal government, not by the Commonwealth,
which Burnfield acknowledges. These "flex funds" are
allocated by the Commonwealth but are subject to approval by
the Delaware Valley Regional Planning Commission, an

17

It is unclear whether all of these contributions should be considered part of the Commonwealth's funding of SEPTA. The funds are, at least to some extent, under the Commonwealth's control, and are being given to SEPTA. Whether SEPTA now receives 35% or 52% of its revenue from the Commonwealth, however, is not determinative. Although relevant, the percentage of Commonwealth funding is no longer

---

"interstate, intercounty and intercity agency." Cooper's Br. 18-19. Second, Cooper contends SEPTA's $52.3 million "senior subsidy" and its $17.3 million "shared ride subsidy" are operating revenue, not part of the state's subsidies. *Id.* at 20-21.

The flex funds and the senior and shared ride subsidies are not treated the same by SEPTA or the Commonwealth for accounting purposes. SEPTA's budget defines two types of funding sources – operating revenue and subsidies – and notes that, under SEPTA's enabling legislation, no less than half of SEPTA's budget must be funded through operating revenue. In order to meet this requirement, the Commonwealth has allowed SEPTA to count certain subsidies as revenue. According to Burnfield, the senior and shared ride subsidies were considered operating revenue in order to satisfy this requirement.

Similarly, the flex funds were described as a federal subsidy in every SEPTA budget until 2007, when the funds were then described as a state subsidy. This recharacterization was not due to any change in legislation; rather, SEPTA felt the funds were better described as state subsidies because the Governor had to initiate action to allocate them to SEPTA.

18

predominant. Since *Doe*, we have recognized that "the crux of the state-treasury criterion [is] whether the state treasury is legally responsible for the payment of a judgment against the [entity]." *Febres*, 445 F.3d at 233; *see also Bowers*, 475 F.3d at 547 ("The appropriate question to ask . . . is whether the State is *obligated* to pay or reimburse the [entity] for its debts."). In *Febres*, we explained that, even though the Camden Board of Education received 85% to 90% of its funding from New Jersey, "the fact that New Jersey is the principal source of the Board's finances does not alone confer immunity, or even compel a finding that this prong of the analysis favors immunity." 445 F.3d at 232-33; *see also id*. at 233 n.5 (noting that "the quantity or proportion of state funding received by an entity is not dispositive," but may be "potentially probative"). Although, relative to *Bolden*, the increased proportion of Commonwealth funding SEPTA now receives – whether 35% or 52% – improves SEPTA's argument for immunity under the state-treasury factor, we no longer afford this subfactor the same weight we did in *Bolden*.[8]

_____

[8]Nor are we able at this time to forecast what impact, if any, the enactment of Act 44 may have on the extent of funding SEPTA receives from the Commonwealth. As noted, Act 44, 74 Pa. Cons. Stat. §§ 1501–1520, was enacted after briefing but before oral argument. Act 44 repealed the provisions under Title 74's "Public Transportation Assistance" chapter, most of which were enacted as part of Act 26, and set forth a new chapter entitled "Sustainable Mobility Options." This new

19

Post-*Doe*, "the key factor in our assessment of the state-treasury prong" is the potential legal liability of the Commonwealth for SEPTA's debts. *Febres*, 445 F.3d at 236. By statute, the Commonwealth has disclaimed any liability for SEPTA's debts:

The authority shall have no power, at any time or

---

chapter established the Public Transportation Trust Fund ("PTTF"), from which public transit entities throughout the state may apply for and receive funding. *See id.* § 1506. Under Act 26, the Commonwealth annually determined the level of appropriation to distribute to these entities. *See* 74 Pa. Cons. Stat. § 1303(a) (repealed 2007). Now, Act 44 sets forth the amount to be placed into the PTTF each year. 74 Pa. Cons. Stat. § 1506(b)(1). From 2007 to 2010, $250 million is placed into the fund each fiscal year, and for every fiscal year thereafter, the fund will be increased 2.5% from the previous year's amount. *Id.* Although the Commonwealth may contribute more money to SEPTA because of the PTTF's creation, there is no evidence as to how much money SEPTA will receive from the PTTF. While the statute sets forth a definitive number for the fund overall, public transit entities from around the state may apply for financial assistance, so we cannot know whether the Commonwealth will contribute more to SEPTA because Act 44 was enacted. Accordingly, since Act 44's impact on SEPTA's funding is still uncertain, we will not give it weight in our consideration of the state-treasury factor.

20

in any manner, to pledge the credit or taxing power of the Commonwealth or any other government agency, nor shall any of the authority's obligations be deemed to be obligations of the Commonwealth or of any other government agency, nor shall the Commonwealth or any government agency be liable for the payment of principal or interest on such obligations.

74 Pa. Cons. Stat. § 1741(c). SEPTA concedes that the Commonwealth is not obligated to pay for an adverse judgment against it. This absence of legal liability provides "a compelling indicator that the state-treasury criterion . . . weighs against immunity." *Febres*, 445 F.3d at 236.

Nevertheless, SEPTA contends the Commonwealth, despite its legal shield from liability, would be forced as a practical matter to pay excess judgments against SEPTA. Thus, the arguable practical effect of an adverse judgment against SEPTA would be an increase in state funding. But "if a State is not under a legal *obligation* to satisfy a judgment, then any increase in expenditures in the face of an adverse judgment is considered a voluntary or discretionary subsidy not entitled to Eleventh Amendment protections." *Bowers*, 475 F.3d at 547; *see also Bolden*, 953 F.2d at 819 ("Such discretionary subsidies committed in reaction to a judgment . . . would not necessarily transform the recipients into alter egos of the state."); *Fitchik*, 873 F.2d at 661 ("Although New Jersey might appropriate funds

21

to [New Jersey Transit] to meet any shortfall caused by judgments against [New Jersey Transit], such voluntary payments by a state do not trigger sovereign immunity."). Although in *Febres* we did not disregard the practical effects of an adverse judgment, neither did we afford them substantial weight:

> In view of the controlling Supreme Court jurisprudence, as well as our own conforming case law, we find that the practical or indirect financial effects of a judgment may enter a court's calculus, but rarely have significant bearing on a determination of an entity's status as an arm of the state.

445 F.3d at 236.

In support, SEPTA points to two cases in which Courts of Appeals have found transit operations were arms of the state. *See Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993); *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218 (D.C. Cir. 1986). These cases were cited by the Supreme Court in *Hess* and their facts, as we noted in *Febres*, "suggest the types of limited circumstances in which the Court might expect . . . concerns [regarding the practical effects of an adverse judgment] to require immunity, regardless of the state's legal liability." *Febres*, 445 F.3d at 235 n.9. In rejecting sovereign immunity, our analysis in *Febres* distinguished both cases:

22

In *Morris*, immunity was accorded to an interstate transit system. Analysis of both the entity's status under state law and its limited autonomy suggested it was an arm of the two states the transit system served. While the states involved were not directly liable, Congressional funding for the system was made contingent upon the states' agreement to meet the system's operating deficits, which could include adverse judgments. And, from the beginning it was fully anticipated that the entity would have large deficits and thus continually be dependent on the states for its financial survival. *Alaska Cargo Transport* held that the railroad at issue was entitled to immunity as an alter ego of the state, even though the state had expressly disclaimed liability for it by statute. The case turned on the critical function performed by the railroad in Alaska, and federal laws which essentially required the state to keep the railroad afloat.

*Id.* (citations omitted).

SEPTA's funding relationship with the Commonwealth does not fall within such "limited circumstances." *Morris* and *Alaska Cargo Transport* are factually distinguishable. In *Morris,* the states at issue were compelled to cover the deficits of the bi-state transit system because, if they did not, they would lose congressional funding. 781 F.2d at 225-26. In *Alaska*

23

*Cargo Transport*, Alaska would have lost the real property conveyed to it by the United States if the railroad failed. 5 F.3d at 381. The Commonwealth here does not face the same sort of practical obligation to support SEPTA in the event of an adverse judgment. As the District Court found, if the Commonwealth fails to cover a deficit, SEPTA can satisfy the deficit itself by raising fares, reducing service, and/or laying off employees. The Commonwealth may choose to relieve SEPTA of these measures, but it is not obligated – through risk of losing its own funding or its own property – to do so. *Cf. Hess*, 513 U.S. at 49-51 (distinguishing *Morris* and *Alaska Cargo Transport* and finding that, since "legally and practically" neither New York nor New Jersey was "obligated to bear and pay . . . [PATH's] indebtedness . . . [,] the Eleventh Amendment's core concern [was] not implicated").

According to SEPTA, measures like fare increases and service reductions "are not practical options under the circumstances" because "the fare increases and service cuts necessary to meet SEPTA's budget shortfall would so reduce the level of service and ridership as to create a public crisis in the region." SEPTA's Br. 32 (internal quotation marks and emphasis omitted). Given these consequences, SEPTA contends, the Commonwealth would effectively be obligated to increase its funding to cover any excess judgment. While fare increases, service reductions, and/or employee layoffs are not the preferred method of meeting budget deficits, these measures

24

are available to SEPTA[9] and do not give rise to an obligation for the Commonwealth. Accordingly, even when we allow the practical effects asserted by SEPTA to "enter [our] calculus," we believe this is not the rare case in which such considerations should have any "significant bearing" on our determination. *Febres*, 445 F.3d at 236.

Despite SEPTA's practical-effects argument, the state-treasury factor weighs against a finding of immunity. While the Commonwealth provides substantial funding, SEPTA also receives a significant amount of its funding from non-state sources of revenue – and whether two-thirds or one-half of SEPTA's overall budget, it totals in the hundreds of millions. SEPTA could satisfy an adverse judgment from these sources, or through alternate measures such as raising fares or reducing service. *See id.* at 233-34 (noting that, "[w]hile non-state funds comprise a relatively small percent of the Board's budget, they still total a significant sum [of nearly $32.5 million]," and the Board could "increase funds" further by "reduc[ing] expenses" or "sell[ing] assets"). SEPTA has provided no evidence that the

[9]Although SEPTA presents these measures as impractical, it did account for them in its budget: "Further efforts to achieve the legislated balanced budget can only be successful through a long-term dedicated source of subsidies. If this fails, SEPTA will be forced to consider steep fare increases and significant service reductions in order to fund projected budget deficits of nearly $325 million by Fiscal Year 2011."

Commonwealth would, in fact, contribute additional funding to SEPTA in the event of an excess judgment. *See id.* at 236 ("While we have little doubt that the state has an interest in seeing that Camden's schools remain operational, it would be improper to confer immunity based on our conjecture about the steps New Jersey might take following a judgment."). Most importantly, the Commonwealth is not legally obligated to provide funds to satisfy a judgment against SEPTA. As *Doe* makes clear, the state's potential legal liability is the "key factor" under this prong of analysis and "merits far greater weight" than practical consequences. *Id*. And, as discussed, SEPTA's asserted consequences do not give rise to the sort of practical obligation that could, in some circumstances, bear on our determination. Accordingly, the relevant criteria under the state-treasury factor weigh against a finding of sovereign immunity.

## B. *Status Under State Law*

Under the second factor, we consider "[t]he status of the agency under state law," which includes "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation." *Fitchik*, 873 F.2d at 659; *see also Febres*, 445 F.3d at 230 (noting these as the "[f]our sub-factors . . . relevant to assessing [an entity's] legal status under state law"). According to SEPTA, the Commonwealth's statutory declaration that SEPTA is an arm of the state is essentially dispositive of this factor and our overall

26

inquiry. But as noted, we disagree, and little has changed with regard to SEPTA's status under state law since *Bolden*.

The subfactors here do not point clearly in one direction. Certain attributes of SEPTA under state law weigh against immunity. Under its enabling statute, SEPTA has (1) a separate corporate existence, 74 Pa. Cons. Stat. § 1711(a); (2) the power to sue and be sued, *id*. § 1741(a)(2); and (3) the power to enter into contracts and make purchases on its own behalf, *id*. § 1741(a)(8), (9), (12), (18), (20), (21), (22), (24), (25). Other attributes support immunity: (1) its enabling statute provides that SEPTA "shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof," *id*. § 1711(a), and "shall continue to enjoy sovereign and official immunity, as provided [by the statutory provisions that comprise and pertain to the Pennsylvania Sovereign Immunity Act]," *id*. § 1711(c)(3);[10] (2)

---

[10]This particular language from § 1711(c)(3) was not in effect at the time of our decision in *Bolden*, but first appeared as one of the "transition provisions" codified under § 1711(c) when SEPTA's enabling legislation was amended in 1994. The language from § 1711(a), however, was in effect at the time of *Bolden* and was considered in our analysis there. *See Bolden*, 953 F.2d at 820 (quoting 55 Pa. Stat. Ann. § 600.303(a) (West 1991) (repealed 1991); Act 26, 74 Pa. Cons. Stat. § 1502

SEPTA has the power of eminent domain, *id*. § 1741(a)(13);[11] and (3) SEPTA is immune from state taxation.[12]  As noted in *Bolden*, 953 F.2d at 820, Pennsylvania state courts have recognized SEPTA to be a Commonwealth agency to which the Pennsylvania Sovereign Immunity Act applies.  *See, e.g.*, *Jones v. SEPTA*, 772 A.2d 435, 444 (Pa. 2001) (holding SEPTA immune in a tort case because the case did not fall within an exception to the Sovereign Immunity Act); *Feingold v. SEPTA*, 517 A.2d 1270, 1276-77 (Pa. 1986) (finding that SEPTA is "an agency of the Commonwealth" against whom "it would be inappropriate to assess punitive damages").  In other contexts, however, Pennsylvania courts have declined to treat SEPTA as

_____

(repealed 1994)).

    [11]In *Fitchik*, we did not accord significant weight to this factor because counties, municipalities, and privately owned public utilities all have the power of eminent domain.  873 F.2d at 663.

    [12]The District Court said the Supreme Court of Pennsylvania, in *SEPTA v. Board of Revision of Taxes*, 833 A.2d 710 (Pa. 2003), held SEPTA is not immune for all purposes from state taxation.  That case, however, addressed SEPTA's immunity from local real estate taxes, finding SEPTA was not immune from these taxes for property it operates as a commercial landlord because such use was not within its operations as a "metropolitan transportation authority."  *Id*. at 717.

28

the Commonwealth. *See, e.g.*, *Fraternal Order of Transit Police v. SEPTA*, 668 A.2d 270, 272 (Pa. Commw. Ct. 1995) (holding "that for purposes of determining jurisdiction, SEPTA is a local agency and not a Commonwealth agency"); *SEPTA v. Union Switch & Signal, Inc.*, 637 A.2d 662, 669 (Pa. Commw. Ct. 1994) ("Because SEPTA is financially independent of the Commonwealth and its operations are not statewide, we conclude that the General Assembly did not intend SEPTA to be the Commonwealth for purposes of the Board Claims Act."); *Fisher v. SEPTA*, 431 A.2d 394, 397 (Pa. Commw. Ct. 1981) ("We do not believe that the Legislature intended SEPTA to be a Commonwealth agency in the traditional sense or for SEPTA employees to be considered Commonwealth employees for purposes of other legislative enactments.").

SEPTA contends that, in light of Supreme Court precedent, the "explicit treatment of SEPTA as a Commonwealth agency entitled to sovereign immunity cannot be evaluated as merely just another 'factor' – let alone one which weighs only 'slightly' in favor of immunity – but should effectively be dispositive as to whether SEPTA is an arm of the State." SEPTA's Br. 23-24. According to SEPTA, the District Court "inappropriately minimize[d] the significance of how the Commonwealth has structured SEPTA and intentionally invested the agency with sovereign immunity." *Id.* at 21-22.

The Commonwealth's designation of SEPTA as an agency covered under the Pennsylvania Sovereign Immunity Act is significant but not dispositive. As discussed, SEPTA's

29

enabling legislation grants it attributes that are characteristic of an arm of the state, and those that are not. In *Bolden*, we rejected SEPTA's contention that "the Pennsylvania Sovereign Immunity Act conferred Eleventh Amendment protection upon SEPTA." 953 F.2d at 817; *see also id.* (explaining that "[i]f this reasoning were accepted, each state legislature apparently could confer Eleventh Amendment protection on any entity it wished, including counties and cities, by enacting a statute clothing these entities with 'sovereign immunity' from suit on state claims"). Although we have revised our immunity analysis since *Bolden*, we do not believe this alters our ultimate conclusion on this point.

In *Doe*, the Court recognized that an inquiry into an agency's immunity "can be answered only after considering the provisions of state law that define the agency's character." 519 U.S. at 429 n.5. The Court also made clear that "[u]ltimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State . . . is a question of federal law." *Id.* This distinction corresponds with the status-under-state-law analysis we applied in *Bolden* and have applied since. The Commonwealth's statutory declaration of SEPTA's immunity under state law is significant but not "dispositive" of our inquiry – it is certainly relevant, but does not necessarily overshadow the other relevant subfactors in assessing an agency's status under state law for Eleventh Amendment purposes.

SEPTA misinterprets the District Court's analysis. The

30

court did not find the Commonwealth's characterization of SEPTA weighed only slightly in favor of finding immunity; rather, the court weighed that consideration together with the other subfactors in the status-under-state-law analysis. SEPTA's status under state law has not changed markedly since *Bolden* – it retains the same essential attributes as before. Nor has the law since *Bolden* changed in a manner that would alter the outcome when these attributes are weighed together. Accordingly, we find SEPTA's status under state law weighs slightly in favor of a finding of sovereign immunity.

## C. *Autonomy*

Under the third factor, we consider "[w]hat degree of autonomy the agency has." *Fitchik*, 873 F.2d at 659. The District Court found SEPTA's autonomy from the Commonwealth has not changed since *Bolden*. While SEPTA's organizational structure has remained the same over that time, SEPTA contends the Commonwealth's current statutory scheme for the financing of public transportation – which allows the Commonwealth to oversee and place certain requirements on the use of the funds it provides to SEPTA – marks a significant change in SEPTA's autonomy.

In *Bolden*, we did not explicitly say whether the autonomy factor weighed in favor of granting or denying immunity. We noted that, while this factor weighed slightly in favor of immunity for New Jersey Transit in *Fitchik*, SEPTA enjoyed greater autonomy than New Jersey Transit, making its

31

argument for immunity under this factor "appreciably weaker." *Bolden*, 953 F.2d at 820. The structure of SEPTA's board has not changed since *Bolden*. SEPTA's board includes five members who are appointed by the Commonwealth, while the remaining ten members are appointed by the counties SEPTA serves.[13] 74 Pa. Cons. Stat. § 1713(a). The board's decisions are not subject to gubernatorial veto. Moreover, the board has substantial authority: it has the power to bring lawsuits; organize its internal structure; buy insurance; buy, sell, or lease property; set and alter fares; and enter into contracts. The District Court, looking at this unchanged structure, found the autonomy factor weighed against immunity.

SEPTA contends its autonomy has decreased since *Bolden* because of the passage of Act 26. We did not consider Act 26 in *Bolden* because we believed its future impact was too uncertain at that time. 953 F.2d at 819-20. In creating a dedicated source of Commonwealth funding for public transit entities, Act 26 increased the Commonwealth's oversight of SEPTA – by, for example, requiring SEPTA to submit budgets and accountings to the Pennsylvania Department of Transportation ("PennDOT"), to perform audits and submit action plans to the Pennsylvania legislature, and to seek the

---

[13]As we noted in *Bolden*, the board's makeup suggests influence on SEPTA by the counties, but "it is the influence of the state, not that of the counties, that is important for Eleventh Amendment purposes." 953 F.2d at 820.

32

review and approval of the Commonwealth for use of the distributed funds in SEPTA's capital projects. *See* Act 26, 74 Pa. Cons. Stat. §§ 1301–1313 (repealed 2007), § 1314 (repealed 1994). Act 44, however, recently replaced this portion of Act 26.

Act 44 established the Public Transportation Trust Fund ("PTTF"), which provides a source of state funding for public transportation, and set forth certain requirements for public transit providers to obtain funding. To initiate funding through the PTTF, a provider of public transit must submit a written application to PennDOT. 74 Pa. Cons. Stat. § 1507(a). If PennDOT determines the applicant is eligible, PennDOT and the applicant enter into a "financial assistance agreement," which "set[s] forth the terms and conditions governing the use of the financial assistance and the timing of payment of the funds." *Id*. § 1507(b). PennDOT is required to develop guidelines governing the application for and awarding of financial assistance. *Id*. All funds "shall be used only for activities set forth under the financial assistance agreement unless the department grants the award recipient a waiver allowing the funds to be used for a different purpose." *Id*. § 1507(c). PennDOT also "may conduct performance reviews of an award recipient . . . to determine the effectiveness of the financial assistance." *Id*. § 1513(e)(1). Based on these reviews, PennDOT must deliver a report to the Governor and to the chair and minority chair of both the House and Senate Transportation Committees. *Id*. § 1513(e)(2). If a recipient does not satisfy

33

certain "performance criteria" set forth by PennDOT, it risks losing funding, although PennDOT may also waive any reduction in funding upon a recipient's written request. *Id*. § 1513(g).

Act 26 and Act 44 have increased the Commonwealth's level of oversight since *Bolden*. But the Commonwealth's control over SEPTA is not sufficient to support a finding of immunity under this factor. Act 44 allows the Commonwealth, through financial assistance agreements, to set terms and conditions for the use of the funds provided to SEPTA. Thus, the more SEPTA relies on the Commonwealth for funding, the greater the impact this financing scheme may have on SEPTA's autonomy. As it currently stands, however, sources other than the Commonwealth contribute one-half to two-thirds of SEPTA's funding, a substantial sum over which the Commonwealth exerts no control. Should the percentage of SEPTA's funding provided by the Commonwealth increase, the Commonwealth's potential influence over SEPTA would also increase under the terms and conditions it may choose to impose on those funds. But, as previously noted, we are presently unable to forecast whether and to what extent such an increase may occur under Act 44.

Furthermore, even though this financing scheme may grant the Commonwealth more influence over SEPTA than it enjoyed in *Bolden*, the amount of autonomy SEPTA retains with respect to its operations and decisions demonstrates that it is still not an arm of the state. *Febres* provides a good comparison. In

34

that case, the Camden Board of Education was subject to a New Jersey statute that granted the Governor authority to accept or reject any action taken by the Board. *Febres*, 445 F.3d at 231. The Governor also appointed board members, though not enough to make a majority. *Id*. Given this degree of state control, we found the autonomy factor weighed slightly in favor of Eleventh Amendment immunity. *Id*. at 232.

The amount of state control in *Febres* exceeds the amount of Commonwealth control here. While PennDOT can influence SEPTA by setting certain requirements for the use of Commonwealth funds, the Commonwealth lacks a mechanism, such as the gubernatorial veto in *Febres*, by which it may dictate the outcome of decisions made by SEPTA's board of directors. As noted, the Commonwealth appoints only a minority of the directors on the board, nor does it review every board decision. Through conditional funding, the Commonwealth can affect the consequences of these decisions, limiting SEPTA's autonomy to some extent. But this is insufficient to transform SEPTA into an arm of the state. Nor does it distinguish SEPTA from other entities that do not enjoy sovereign immunity – the Commonwealth exercises this same conditional-funding influence over any entity that applies for financial assistance through the PTTF, including political subdivisions which, as the Supreme Court has made clear, are not arms of the state.[14] *See*

---

[14]Act 44 specifies the following entities as eligible applicants "for financial assistance for operating expenses": "(1) The

35

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities . . . ."); *see also Bolden*, 953 F.2d at 813 (recognizing the same).  Given how recently Act 44 was enacted, the precise degree of control the Commonwealth wields over SEPTA through this financing scheme is still uncertain at this time.  We do not know yet how the scheme will be interpreted and implemented – the evidence before us, for example, does not include an Act 44 "financial assistance agreement" with which SEPTA would have to comply in order to receive Commonwealth funding.  Thus, as with Act 26 in *Bolden*, it is too early for us to tell what impact, if any, Act 44 may have on SEPTA's autonomy from the Commonwealth.

While SEPTA's autonomy has diminished since *Bolden* because of the Commonwealth's financing scheme under Act 26 and now Act 44, it is SEPTA's burden to show it is entitled to sovereign immunity.  *Febres*, 445 F.3d at 229.  Based on the evidence presented, the Commonwealth's control over SEPTA falls short of the state control present in *Febres*, a case in which we found the autonomy factor weighed only slightly in favor of

---

governing body of a municipality or an instrumentality of a municipality.  (2) A Commonwealth agency or instrumentality.  (3) A local transportation organization."  74 Pa. Cons. Stat. § 1513(a).

sovereign immunity. Here, by comparison, we find this factor weighs slightly against a finding of Eleventh Amendment immunity.

## D. *Balancing the Factors*

As noted, we no longer give primacy to the state-treasury factor in our immunity analysis. Instead, we give equal consideration to all three factors and weigh and balance them. Here, despite an increase in state funding, the state-treasury factor still weighs against a finding of sovereign immunity. As SEPTA's status under state law has not changed significantly since *Bolden*, that factor weighs slightly in favor of immunity. The autonomy factor weighs slightly against immunity. Balancing these factors, we agree with the District Court that SEPTA is not entitled to Eleventh Amendment immunity.

## V.

Accordingly, we will affirm the District Court's denial of SEPTA's motion for summary judgment. We will remand to the District Court for proceedings consistent with this opinion.

37