**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2171
_____

DON KARNS,
                              Appellant

v.

KATHLEEN SHANAHAN; SANDRA MCKEON CROWE;
NEW JERSEY TRANSIT; JOHN DOE SUPERVISORS #1-50


_____

No. 16-2172
_____

ROBERT PARKER,
                              Appellant

v.

KATHLEEN SHANAHAN; SANDRA MCKEON CROWE;
NEW JERSEY TRANSIT; JOHN DOE SUPERVISORS #1-50
_____

Appeal from the United States District Court
for the District of New Jersey
(Nos. 3:14-cv-04429 & 3:14-cv-4104)
District Judge:  Hon. Mary L. Cooper
_____

Argued:  January 26, 2017

Before:  CHAGARES, RESTREPO, and ROTH,
Circuit Judges
_____

(Filed: January 11, 2018)


John M. Bloor, Esq. **[ARGUED]**
Drinker Biddle & Reath
18th and Cherry Streets
One Logan Square, Suite 2000
Philadelphia, PA 19103

F. Michael Daily, Jr., Esq.
216 Haddon Avenue
Sentry Office Plaza, Suite 106
Westmont, NJ 08108

Counsel for Appellants

Jennifer J. McGruther, Esq. **[ARGUED]**
Stephen R. Tucker, Esq.
Benjamin H. Zieman, Esq.
Office of Attorney General of New Jersey
Department of Law & Public Safety
Division of Law
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625

     Counsel for Appellees

_____

OPINION
_____

CHAGARES, Circuit Judge.

Don Karns and Robert Parker filed civil rights actions against the New Jersey Transit Corporation ("NJ Transit") and NJ Transit Officers Kathleen Shanahan and Sandra McKeon Crowe in their official and individual capacities, alleging violations of the First, Fourth, and Fourteenth Amendments. Officers Shanahan and Crowe arrested Karns and Parker for defiant trespass and obstruction of justice after Karns and Parker refused to vacate the NJ Transit train platform on which they were preaching without the required permit. The District Court granted the defendants' motion for summary judgment on Eleventh Amendment immunity and qualified immunity

grounds. This consolidated appeal followed. For the reasons that follow, we will affirm the District Court's judgment.

I.

Karns and Parker are evangelical Christian ministers who regularly preach the Christian gospel. At around 6:00 a.m. on June 26, 2012, Karns and Parker were loudly preaching on the railway platform at the Princeton Junction station, which is owned by NJ Transit. They also carried signs with Bible verses on them. Parker had previously been informed that a permit was required to preach on NJ Transit property pursuant to N.J. Admin. Code § 16:83-1.1, which provides that persons wishing to engage in non-commercial speech on NJ Transit property are required to obtain a non-commercial certificate of registration.[1] Appendix ("App.") 118. Karns was apparently unaware of this requirement. App. 244–45. Neither Karns nor

---

[1] Permits are available on a first-come, first-served basis. App. 241. All permits are approved as long as the applicant executes the permit and states his or her understanding of the relevant regulations. App. 243. NJ Transit typically issues ten to twenty permits weekly. App. 243. Indeed, the record shows that between June 2012 and July 2012, NJ Transit received forty-six permit requests, including thirty from religious organizations or entities and fifteen from political campaigns or entities. App. 116; 118–19. Only two of these requests were denied, either because the permit was returned too late or not at all. App. 119–20. Permit holders are required to remain at specific locations within the station as determined by the station manager to ensure the safety of NJ Transit customers and permit holders. App. 241–42.

Parker applied for or obtained such a permit during the period leading up to the incident giving rise to this lawsuit.

Officers Shanahan and Crowe are law enforcement officers who are NJ Transit employees. NJ Transit maintains a policy that its officers be familiar with and uniformly enforce the permitting regulations, and all NJ Transit officers were instructed on this policy. App. 136; App. 470–71; App. 858. This policy was communicated in an email dated May 6, 2010 from NJ Transit Deputy Chief Joseph Kelly. **App. 136.** The email instructed that in the event a NJ Transit officer observes an individual engaging in non-commercial speech without a permit, the officer should explain the permitting rules and provide information about the permit application process. App. 136. The email directed that the officer shall take "appropriate enforcement action" if the individual has been made aware of the application process and permit requirement and continues to engage in non-commercial expression. App. 136.

While on patrol on the morning of June 26, 2012, Officers Shanahan and Crowe received a radio dispatch informing them that individuals were preaching loudly on the Princeton Junction station platform. This was not the first incident of loud preaching on NJ Transit property. Rather, there had been several incidents involving "[c]ommuters complaining of loud preaching at different stations" throughout the NJ Transit system. App. 470.

In response to the dispatch call, Officers Shanahan and Crowe approached the Princeton Junction station. The officers were able to hear shouting emanating from the platform from as far as the parking lot beside the station. Once on the train

5

platform, Officers Shanahan and Crowe approached Karns and Parker, noticing that Parker's behavior "was not the normal behavior of a commuter" and that he "was shaking uncontrollably." App. 208. Officer Crowe indicated that she "wasn't paying attention to what [the plaintiffs] were saying" as she approached them. App. 197. Karns and Parker ceased preaching as the officers approached them. Parker took out his cell phone to record the encounter, but Officer Shanahan requested that he put it away. Parker eventually complied. The officers then asked Karns and Parker whether they had a permit to speak at the station. They responded that they did not. Officer Shanahan informed them that a permit was required, but Parker responded that he had been preaching at the station for years without any form of permit.

The officers then asked Parker to provide identification. Parker produced an expired college identification card. Karns refused to provide any form of identification. Believing that Karns and Parker were interfering with their investigation by failing to produce sufficient identification, the officers then arrested Karns and Parker and charged them each with one count of obstruction under N.J. Stat. Ann. § 2C:29-1(a) and one count of obstruction under N.J. Stat. Ann. § 2C:29-1(b). Karns and Parker were also each charged with one count of defiant trespass in violation of N.J. Stat. Ann. § 2C:18-3(b) on the basis of the officers' belief that engaging in non-commercial expression on NJ Transit property without a permit constitutes trespassing.

Karns was ultimately acquitted of all charges. The obstruction of justice charges against Parker were dismissed, but he was convicted of defiant trespass. That charge was ultimately reversed by the New Jersey Superior Court.

6

On June 26, 2014, Karns and Parker jointly filed a complaint against NJ Transit and Officers Shanahan and Crowe in their official and individual capacities. The District Court ordered Karns to file an amended complaint and Parker to file a separate complaint. On July 14, 2014, Karns and Parker filed individual complaints, each alleging violations of the First, Fourth, and Fourteenth Amendments. The actions were consolidated for discovery purposes, and NJ Transit and the officers moved for summary judgment. On March 31, 2016, the District Court granted summary judgment in favor of all of the defendants and against Karns and Parker.

Karns and Parker filed this timely appeal.

II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment and apply the same standard as the District Court. Goldenstein v. Repossessors Inc., 815 F.3d 142, 146 (3d Cir. 2016); Beers–Capitol v. Whetzel, 256 F.3d 120, 130 n.6 (3d Cir. 2001). We review de novo the legal grounds underpinning a claim of qualified immunity or sovereign immunity. Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014); Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 694 (3d Cir. 1996).

III.

Karns and Parker first argue that the District Court erred by concluding that NJ Transit was an "arm of the state" entitled to claim immunity from suit in federal court under the Eleventh

7

Amendment. They relatedly argue that NJ Transit is liable for damages under 42 U.S.C. § 1983 for maintaining unconstitutional policies relating to the permitting scheme. We have considered Karns's and Parker's arguments and, for the following reasons, we will affirm the District Court's judgment.

A.

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court in Hans v. Louisiana, 134 U.S. 1 (1890), "extended the Eleventh Amendment's reach to suits by in-state plaintiffs, thereby barring all private suits against non-consenting States in federal court." Lombardo v. Pa., Dep't of Pub. Welfare, 540 F.3d 190, 194 (3d Cir. 2008) (emphasis omitted). Immunity from suit in federal court under the Eleventh Amendment is designed to preserve the delicate and "proper balance between the supremacy of federal law and the separate sovereignty of the States." Alden v. Maine, 527 U.S. 706, 757 (1999). The Eleventh Amendment serves two fundamental imperatives: safeguarding the dignity of the states and ensuring their financial solvency. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 52 (1994) (identifying "States' solvency and dignity" as the concerns underpinning the Eleventh Amendment).

It is "well established that even though a State is not named a party to the action, the suit may nonetheless be barred

8

by the Eleventh Amendment." Edelman v. Jordan, 415 U.S. 651, 663 (1974).[2] The Eleventh Amendment immunizes from suit in federal court both non-consenting states and those entities that are so intertwined with them as to render them "arms of the state." Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 545 (3d Cir. 2007), amended on reh'g (Mar. 8, 2007). Eleventh Amendment immunity does not, however, extend to counties and municipalities despite their status as political subdivisions of a state. See Bolden v. Se. Pa. Transp. Auth., 953 F.2d 807, 813 (3d Cir. 1991) (en banc). In determining whether an entity is entitled to immunity, we must consider "the provisions of state law that define the agency's character," but the ultimate question of "whether a particular state agency [is] . . . an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law." Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430 n.5 (1997).

We apply a fact-intensive three-part test to determine whether an entity is an "arm of the state" for Eleventh Amendment purposes. Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989) (en banc) (citing Urbano v. Bd. of Managers, 415 F.2d 247, 250–51 (3d Cir. 1969)). We

---

[2] As we have discussed in other contexts, "the Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity." Lombardo, 540 F.3d at 195 (quoting Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 753 (2002)). This case principally concerns only immunity from suit in federal court — Eleventh Amendment immunity — and not immunity from liability, and thus we address only that aspect of sovereign immunity herein.

9

examine the following factors: "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." Bowers, 475 F.3d at 546. Subsequent to "identifying the direction in which each factor points, we balance them to determine whether an entity amounts to an arm of the State." Maliandi v. Montclair State Univ., 845 F.3d 77, 84 (3d Cir. 2016).

We historically considered the first factor — the state-treasury factor — as "most important." Fitchik, 873 F.2d at 659; see also Bolden, 953 F.2d at 818. Hence, in Fitchik itself, we concluded that because the funding factor disfavored immunity and because the remaining two factors — status under state law and the degree of autonomy — only "slightly" favored a finding of immunity, NJ Transit was not entitled to claim Eleventh Amendment immunity. 873 F.2d at 664. Since our decision in Fitchik, however, we have "recalibrated the factors," Maliandi, 845 F.3d at 84, in light of the Supreme Court's intervening precedent in Regents of the University of California v. Doe. In Regents of the University of California, the Supreme Court recognized that "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant" to the Eleventh Amendment inquiry. 519 U.S. at 431. The Court emphasized that the inquiry into immunity from suit in federal court is not merely "a formalistic question of ultimate financial liability." Id.; see also Cooper v. Se. Pa. Transp. Auth., 548 F.3d 296, 302 (3d Cir. 2008).

The Supreme Court's holding in Regents of the University of California has led us to depart from the analytical

framework articulated in <u>Fitchik</u>, and we thus "no longer ascribe primacy to the [state-treasury] factor." <u>Benn v. First Judicial Dist. of Pa.</u>, 426 F.3d 233, 239 (3d Cir. 2005). Under this evolved approach, none of the three <u>Fitchik</u> factors is "predominant." <u>Cooper</u>, 548 F.3d at 301. Rather, each of the factors is considered "co-equal," <u>Benn</u>, 426 F.3d at 240, and "on the same terms," <u>Cooper</u>, 548 F.3d at 302. We emphasize that courts should not simply engage in a formulaic or mechanical counting up of the factors, nor do we do so here. Rather, each case must be considered on its own terms, with courts determining and then weighing the qualitative strength of each individual factor in the unique factual circumstances at issue. <u>See</u> <u>Maliandi</u>, 845 F.3d at 84 (explaining that each cases requires a "fresh analysis" and "'individualized determinations' for each entity claiming Eleventh Amendment immunity" (quoting <u>Bowers v. Nat'l Collegiate Athletic Ass'n</u>, 475 F.3d 524, 546 (3d Cir. 2007))). While the <u>Fitchik</u> Court's analysis of each individual factor "remains instructive," <u>Cooper</u>, 548 F.3d at 302, we consider and weigh each factor on the record before us today.

Notwithstanding this fundamental shift in our approach to Eleventh Amendment immunity analysis, Karns and Parker argue that the balancing analysis we conducted in <u>Fitchik</u> must control the outcome of this case. Karns and Parker specifically maintain that NJ Transit is collaterally estopped[3] from raising

---

[3] Collateral estoppel, also known as issue preclusion, prohibits relitigation of an issue that has been fully and fairly litigated previously. The elements for collateral estoppel are satisfied when: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment;

11

an Eleventh Amendment immunity defense because in Fitchik we determined that the three factors, on balance, weighed against affording Eleventh Amendment immunity to NJ Transit. See Karns and Parker Br. 14–15. This argument overlooks the significant evolution of Supreme Court jurisprudence and our own conforming law in this area since Fitchik. Contrary to Karns's and Parker's suggestion, collateral estoppel is not appropriate when the "controlling facts or legal principles have changed significantly since the [prior] judgment." Montana v. United States, 440 U.S. 147, 155 (1979); see also Duvall v. Att'y. Gen. of United States, 436 F.3d 382, 391 (3d Cir. 2006) ("[Collateral estoppel] . . . will not preclude relitigation of the issue when there is . . . a material intervening change in governing law."). Collateral estoppel, then, does not preclude us from reconsidering our balancing of the Fitchik factors in light of intervening Supreme Court precedent.

Our Internal Operating Procedures also do not prevent us from revisiting the balancing analysis conducted in Fitchik. Pursuant to those procedures, "the holding of a panel in a

---

and (4) the determination [was] essential to the prior judgment." Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 342 F.3d 242, 252 (3d Cir. 2003) (alterations in original) (quoting Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 288 F.3d 519, 524–25 (3d Cir. 2002)). Karns and Parker here invoke a variant of this doctrine, known as offensive non-mutual collateral estoppel, in which "a plaintiff [seeks] to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 329 (1979).

precedential opinion is binding on subsequent panels." 3d Cir. I.O.P. 9.1. We are therefore generally obligated to follow our precedent absent en banc reconsideration. United States v. Tann, 577 F.3d 533, 541 (3d Cir. 2009). Nonetheless, a panel may revisit a prior holding of the Court "which conflicts with intervening Supreme Court precedent." In re Krebs, 527 F.3d 82, 84 (3d Cir. 2008); see also Council of Alt. Political Parties v. Hooks, 179 F.3d 64, 69 (3d Cir. 1999) (observing that reconsideration of an issue decided by another panel of our Court in a prior appeal is appropriate when there has been an intervening change in law). Indeed, we are "compelled to apply the law announced by the Supreme Court as we find it on the date of our decision." Tann, 577 F.3d at 541 (quoting United States v. City of Philadelphia, 644 F.2d 187, 192 n.3 (3d Cir. 1980)); see also Mennen Co. v. Atl. Mut. Ins. Co., 147 F.3d 287, 294 n.9 (3d Cir. 1998) (observing that our Court's Internal Operating Procedures must "give way when the prior panel's holding is in conflict with Supreme Court precedent"). Our respect for the uniformity of decisions within this Court therefore must succumb when a prior holding of our Court — even an en banc decision — conflicts with a subsequent Supreme Court holding. See United States v. Singletary, 268 F.3d 196, 202 (3d Cir. 2001).

Adherence to our holding in Fitchik here must yield in light of the Supreme Court's Regents of the University of California decision, which unquestionably presents an intervening shift in the applicable Eleventh Amendment immunity analytical framework. Further, a reflexive application of our original Fitchik framework here would be at odds with the analytical approach employed by our esteemed colleagues in many other Eleventh Amendment cases, thus generating a potentially fractured body of jurisprudence.

13

Compare Cooper, 548 F.3d at 301, Febres v. Camden Bd. of Educ., 445 F.3d 227, 235–36 (3d Cir. 2006), and Benn, 426 F.3d at 239, with Fitchik, 873 F.2d at 664. In these circumstances, we are not bound to follow our prior balancing of factors in Fitchik. We must instead examine each of the three Fitchik factors, balancing them equally, to determine whether NJ Transit's relationship with the state entitles it to immunity under the "holistic analysis" compelled by the Regents of the University of California decision, see Benn, 426 F.3d at 241, and to which we have adhered in our subsequent case law.

1.

Turning to the analysis of whether an entity is an arm of the state, we first ask "[w]hether the money that would pay the judgment would come from the state," which includes considering "whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts." Fitchik, 873 F.2d at 659. Our Court has observed that the "crux of the state-treasury criterion" is not whether the state will be the principal source of any funding, but rather whether the state is "legally responsible for the payment of [the] judgment." Febres, 445 F.3d at 233.

The Fitchik Court concluded that NJ Transit is financially independent from the state. See Fitchik, 873 F.2d at 660–62 (reviewing relevant financial details and observing that NJ Transit's "money does not come predominantly from the state"). The parties have not offered updated financial information to undermine this assessment. NJ Transit instead

14

argues that because it relies on state funds to meet its operating deficit, an adverse judgment would have the practical effect of impacting the state treasury. NJ Transit Br. 27–32. NJ Transit, in support of this position, relies upon two cases in which Courts of Appeals have deemed transit operations arms of the state: Alaska Cargo Transportation, Inc. v. Alaska R.R. Corp., 5 F.3d 378 (9th Cir. 1993) and Morris v. Washington Metropolitan Area Transit Authority, 781 F.2d 218 (D.C. Cir. 1986). In Alaska Cargo Transportation, Inc., the Court of Appeals for the Ninth Circuit afforded Eleventh Amendment immunity to the Alaska Railroad Corporation. Although the state disclaimed liability for it by statute, Alaska still provided it a "financial safety net of broad dimension," largely because federal law effectively required Alaska to keep the railroad operational. Alaska Cargo Transp., Inc., 5 F.3d at 381 ("Significantly, federal law further provides that, until 1994, the State of Alaska must continue to provide rail carrier services across its system."). Similarly, in Morris, Eleventh Amendment immunity was afforded to the Washington Metropolitan Area Transit Authority ("WMATA"), an interstate transit system created by a congressional compact whose signatories were Maryland, Virginia, and the District of Columbia. 781 F.2d at 219. The Court of Appeals for the District of Columbia Circuit determined that the practical result of any judgment against WMATA would be against the treasuries of Maryland and Virginia. Id. at 225–26. As in Alaska Cargo Transportation, Inc., the Morris Court's conclusion was premised on the fact that congressional funding for the system was contingent on the states' agreement to meet WMATA's operating deficits. Id. NJ Transit maintains that both cases are applicable here, yielding the conclusion that the state-treasury factor likewise favors immunity for NJ Transit.

15

We do not agree, and NJ Transit's reliance on both cases is misplaced. We have consistently observed that both Alaska Cargo Transportation and Morris are inapplicable when Congress has not "put a proverbial 'gun to the head' of the State to sustain the entity even without a legal obligation." Maliandi, 845 F.3d at 87 n.7; see also Cooper, 548 F.3d at 305 (discussing but rejecting reliance on both cases because of the lack of congressional coercion); Febres, 445 F.3d at 235 n.9 (distinguishing the cases to the "limited circumstances" under which federal law essentially requires the state to keep afloat the agency claiming immunity). That is plainly not the case here, where the state is under no legal or other obligation to pay NJ Transit's debts or to reimburse NJ Transit for any judgments that it pays. See N.J. Stat. Ann. § 27:25-17. Indeed, this case is much more similar to the Cooper case, where the state treasury factor did not favor immunity because the transportation agency claiming immunity could "satisfy the deficit itself by raising fares, reducing service, and/or laying off employees." Cooper, 548 F.3d at 305. Moreover, New Jersey may choose to appropriate funds to help NJ Transit cover its operating deficit, but it is not obligated to do so. To this end, NJ Transit concedes that it is not entirely reliant on state funds but rather that it receives a "combination of federal, state, and local funds" to balance its budget. NJ Transit Br. 31. We therefore reject NJ Transit's suggestion that the "practical effect" of a judgment would be equivalent to a "legal obligation" sufficient to satisfy the funding factor. See Maliandi, 845 F.3d at 87 n.7. The state-treasury factor, as a result, does not favor a finding of immunity in this case.

2.

16

We turn next to the second Fitchik factor, which requires consideration of the status of the agency under state law. Considerations include "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation." Fitchik, 873 F.2d at 659. We have also considered "the entity's authority to exercise the power of eminent domain, application of state administrative procedure and civil service laws to the entity, the entity's ability to enter contracts and make purchases on its own behalf, and whether the entity owns its own real estate." Maliandi, 845 F.3d at 91. The Fitchik Court concluded that "[b]ecause [NJ Transit's] status under New Jersey law is uncertain, the analysis of this factor does not significantly help in determining whether [NJ Transit] is entitled to immunity from suit in federal court." Fitchik, 873 F.2d at 662. In the twenty-eight years since our Court's decision in Fitchik, however, it has become much more apparent that New Jersey law regards NJ Transit as an arm of the state. The state law factor therefore weighs strongly in favor of immunity.

There is considerable indication that New Jersey law considers NJ Transit an arm of the state. First, consistent with the New Jersey Constitution, NJ Transit is "allocated within the Department of Transportation," N.J. Stat. Ann. § 27:25-4, which is a principal department within the Executive Branch of the State of New Jersey, N.J. Stat. Ann. § 27:1A-2. NJ Transit, moreover, is statutorily "constituted as an instrumentality of the State exercising public and essential governmental functions." N.J. Stat. Ann. § 27:25-4. Although NJ Transit can sue and be sued, N.J. Stat. Ann. § 27:25-5, this is not dispositive. Cf. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 676 (1999)

17

(observing that a state does not "consent to suit in federal court merely by stating its intention to 'sue and be sued'"). NJ Transit is also considered state property for tax purposes and is exempt from state taxation. N.J. Stat. Ann. § 27:25-16. These factors favor immunity. See, e.g., Christy v. Pa. Tpk. Comm'n, 54 F.3d 1140, 1148 (3d Cir. 1995) (noting that exemption from state property taxation is an attribute associated with sovereignty); Skehan v. State Sys. of Higher Educ., 815 F.2d 244, 249 (3d Cir. 1987) (concluding that immunity from local taxation of real property favors immunity). NJ Transit also has the power of eminent domain, N.J. Stat. § 27:25-13(a), (c)(1), which likewise favors immunity. See, e.g., Christy, 54 F.3d at 1148 (recognizing that the power of eminent domain is associated with sovereignty). Finally, NJ Transit officers are vested with "general authority, without limitation, to exercise police powers and duties . . . in all criminal and traffic matters at all times throughout the State." N.J. Stat. Ann. § 27:25-15.1(a). This fact, too, supports the conclusion that New Jersey law regards NJ Transit as exercising the official police powers of the state.

State case law also regards NJ Transit as an agency of the state. For instance, in Muhammad v. New Jersey Transit, 821 A.2d 1148 (N.J. 2003), the New Jersey Supreme Court surveyed its relevant case law and, to "remove any doubt," declared that NJ Transit "is a public entity within the ambit of the [New Jersey Tort Claims Act]." Id. at 1153; see also Cavuoti v. N.J. Transit Corp., 735 A.2d 548, 563 (N.J. 1999) (holding that the New Jersey discrimination statute "allows the award of punitive damages against public entities" and affirming an award of punitive damages against NJ Transit); Weiss v. N.J. Transit, 608 A.2d 254, 258 (N.J. 1992) (holding that NJ Transit is entitled to legislative immunity as a

18

public entity); Maison v. NJ Transit Corp., No. A-1761-14T2, 2015 WL 4067411, at *3 (N.J. Super. Ct. App. Div. (July 6, 2015) (unpublished) ("NJ Transit is a public entity."); Lopez v. N.J. Transit, 684 A.2d 986, 988 (N.J. Super. Ct. App. Div. 1996) ("Plaintiffs' claim [is] against New Jersey Transit, a public entity"). Several other New Jersey cases have also determined that NJ Transit is a surrogate of the state or is a state agency responsible for performing essential governmental functions. See, e.g., Davis v. N.J. Transit, No. A-4901-10T1, 2012 WL 3192716, at *3 (N.J. Super. Ct. App. Div. Aug. 8, 2012) (unpublished) ("[NJ Transit] is a 'surrogate of the State.'" (quoting Geod Corp. v. N.J. Transit Corp., 678 F. Supp. 2d 276, 288 (D.N.J. 2009))); N.J. Transit PBA Local 304 v. N.J. Transit Corp., 675 A.2d 1180, 1181 (N.J. Super. Ct. App. Div. 1996) ("[NJ Transit] is a state agency responsible for operating and improving public transportation in New Jersey."), aff'd, 701 A.2d 1243 (N.J. 1997); see also N.J. Transit Corp. v. Mori, 89 A.3d 237, 239-40 (N.J. Super. Ct. App. Div. 2014) (holding, in a condemnation action instituted by NJ Transit, that "[b]ecause NJ Transit was a public entity, it was entitled to a discounted 2.3 to 1 ratio of filled wetlands to mitigation credits. A private developer, such as Mori, would have paid a high ratio.").[4] In light of this case law, it is apparent that the second Fitchik factor strongly favors a finding of

---

[4] Our dissenting colleague does not address these significant changes in New Jersey law, all of which post-dated our Fitchik decision. Even assuming that the factual record has remained largely unchanged since our Court decided Fitchik, we cannot consider that "status under state law" factor as it was in 1989. Rather, we must contend with relevant legal developments in the twenty-eight years since we first considered the issue.

immunity — a determination that has become that much more apparent since the original <u>Fitchik</u> decision.

3.

Third, we must consider the autonomy of the entity. The <u>Fitchik</u> Court concluded that state's fairly "substantial control" over NJ Transit counseled in favor of according it Eleventh Amendment immunity. <u>Fitchik</u>, 873 F.2d at 664. Our consideration of this factor is largely in accord. NJ Transit is subject to several operational constraints by the New Jersey Legislature and the Governor, who is also responsible for appointing the entire NJ Transit governing board, which is composed of several members of the Executive Branch. N.J. Stat. Ann. § 27:25-4(b); <u>see, e.g.</u>, <u>Bowers</u>, 475 F.3d at 548–49 (holding that a governor's appointment of a state university's entire governing board demonstrated a lack of autonomy favoring immunity); <u>see also</u> <u>Irizarry-Mora v. Univ. of P.R.</u>, 647 F.3d 9, 15 (1st Cir. 2011) ("In further support of the proposition that the University is an arm of the Commonwealth, we note that ten of the thirteen members of its governing board are appointed by the governor."); <u>Md. Stadium Auth. v. Ellerbe Becket Inc.</u>, 407 F.3d 255, 257 (4th Cir. 2005). The Commissioner of Transportation, an Executive Branch official who is the chairman of the NJ Transit governing board, has the power and duty to review NJ Transit's expenditures and budget. N.J. Stat. Ann. § 27:25-20(a). Moreover, NJ Transit must annually report on its condition and its budget to the Governor and the Legislature and is subject to audit at any time. N.J. Stat. Ann. § 27:25-20. The Governor can veto any action taken by NJ Transit's governing board. N.J. Stat. Ann. § 27:25-4(f); <u>see also</u> <u>Fitchik</u>, 873 F.2d at 664 ("[T]he degree of control [of NJ Transit] by the governor is

fairly substantial.").  Certain of its acquisitions are also subject to legislative veto.  <u>See</u> N.J. Stat. Ann. § 27:25-13(h).

All of these facts suggest that NJ Transit is an instrumentality of the state, exercising limited autonomy apart from it.  <u>See, e.g.</u>, <u>Bowers</u>, 475 F.3d at 548–49.  We conclude that the autonomy factor weighs in favor of immunity.

\* \* \* \* \*

After giving equal consideration to all three factors, we weigh and balance them.  We no longer adhere to the balancing analysis conducted in <u>Fitchik</u> in light of intervening changes in Eleventh Amendment immunity analysis articulated by the Supreme Court.  Applying the revised analysis, we determine that while the state-treasury factor counsels against awarding Eleventh Amendment immunity, the state law and autonomy factors both tilt in favor of immunity.  Indeed, in the intervening years since our decision in <u>Fitchik</u>, it has become apparent that the state law factor weighs heavily in favor of a finding of immunity.  Weighing and balancing the qualitative strength of each factor in the context of the circumstances presented, we hold that NJ Transit is an arm of the state.  We therefore conclude that NJ Transit is entitled to claim the protections of Eleventh Amendment immunity, which in turn functions as an absolute bar to any claims in this case against NJ Transit and the officers in their official capacities.[5]

---

[5] Defendants sued in their official capacities are entitled to claim the same Eleventh Amendment immunity that the "entity, <u>qua</u> entity, may possess."  <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 (1985).

B.

Karns and Parker argue that NJ Transit is liable for damages under 42 U.S.C. § 1983 for purportedly maintaining an unconstitutional custom of discriminatory enforcement of the permitting requirement. Karns and Parker Br. 24. They also claim that NJ Transit maintained a policy of promoting illegal arrests unsupported by probable cause. Karns and Parker Br. 33–35. Neither claim is viable.

A plaintiff seeking relief under 42 U.S.C. § 1983 must establish that the individual or entity who allegedly committed the constitutional violation is a "person" for the purposes of § 1983. 42 U.S.C. § 1983; see also Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1172 (3d Cir. 1997). "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" are not "persons" under § 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989); see also Howlett By & Through Howlett v. Rose, 496 U.S. 356, 365 (1990) ("Will establishes that the State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court."). As discussed at length above, see Section III(A), supra, NJ Transit is an arm of the state. The Eleventh Amendment therefore functions as a complete bar, immunizing NJ Transit from any

22

§ 1983 liability.[6]  Accordingly, the District Court did not err in granting summary judgment in favor of NJ Transit as to the claims that it maintained unconstitutional policies.[7]

IV.

Karns and Parker also brought several claims of constitutional wrongdoing pursuant to 42 U.S.C. § 1983 against Officers Crowe and Shanahan in their individual capacities.  Karns and Parker specifically alleged that the officers violated:  (1) the First and Fourteenth Amendments by selectively enforcing N.J. Admin. Code § 16:83-1.4; (2) the First Amendment by arresting them in retaliation for their protected speech; (3) the Fourth Amendment by arresting them without probable cause; and (4) the First Amendment by

_____

[6] We emphasize that the Eleventh Amendment and § 1983 determinations are "analytically distinct," although sometimes overlapping.  Estate of Lagano v. Bergen Cty. Prosecutor's Office, 769 F.3d 850, 857 (3d Cir. 2014); see also Callahan v. City of Philadelphia, 207 F.3d 668, 669 (3d Cir. 2000).  Where, as here, the entity claiming immunity is determined to be an arm of the state, however, it is beyond dispute that it is not a "person" for § 1983 purposes.  See Will, 491 U.S. at 71.

[7] NJ Transit additionally argues that summary judgment is appropriate because Karns and Parker have failed to adduce sufficient evidence to support their unconstitutional permitting policy.  NJ Transit Br. 50.  The District Court did not reach the factual underpinnings of this claim against NJ Transit.  We, too, deem it unnecessary to analyze this claim because it is apparent that Karns and Parker cannot overcome the Eleventh Amendment bar in this case.

23

curtailing their right to record police officers during an investigative detention. The District Court concluded that Crowe and Shanahan were entitled to qualified immunity as to each of these claims. For the following reasons, we agree.

A plaintiff seeking relief under 42 U.S.C. § 1983 must demonstrate "that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). The doctrine of qualified immunity, however, insulates government officials from lawsuits, shielding them "from undue interference with their duties and from potentially disabling threats of liability." Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005) (quoting Elder v. Holloway, 510 U.S. 510, 514 (1994)). In determining the applicability of qualified immunity, courts examine two prongs. First, whether the facts alleged (in the context of a motion to dismiss or for judgment on the pleadings) or shown (in the context of a motion for summary judgment or a trial) "make out a violation of a constitutional right." Pearson v. Callahan, 555 U.S. 223, 232 (2009). Second, "whether the right at issue was 'clearly established' at the time of defendants' alleged misconduct." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). A right is "clearly established" when its "contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Wilson v. Layne, 526 U.S. 603, 615 (1999) (quotation marks omitted). Courts need not evaluate the two prongs sequentially, Pearson, 555 U.S. at 236, and the failure of either prong will result in application of qualified immunity, James v. City of Wilkes-Barre, 700 F.3d 675, 679 (3d Cir. 2012).

24

A.

Karns and Parker first argue that the officers were not entitled to qualified immunity on their selective enforcement claim[8] under the First and Fourteenth Amendments. Upon reviewing the record and considering the evidence in the light most favorable to the plaintiffs, we agree with the District Court that Karns and Parker failed to establish a selective enforcement claim adequate to survive a motion for summary judgment. Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

A plaintiff seeking to establish a selective enforcement claim must demonstrate (1) that he was treated differently from other similarly situated individuals;[9] and (2) that this selective treatment was based on an unjustifiable standard, such as race, religion, some other arbitrary factor or to prevent the exercise of a fundamental right. Dique v. N.J. State Police, 603 F.3d 181, 184 n.5 (3d Cir. 2010); Gov't of V.I. v. Harrigan, 791 F.2d 34, 36 (3d Cir. 1986). Hence, to maintain a selective

---

[8] This claim arises from Karns's and Parker's contention that NJ Transit's permitting policy was selectively enforced against religious speech or speech that the officers deemed "subjectively objectionable." Karns and Parker Br. 19.

[9] "Persons are similarly situated . . . when they are alike in 'all relevant aspects.'" Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).

25

enforcement claim, a plaintiff must provide "evidence of discriminatory purpose, not mere unequal treatment or adverse effect." Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs., 693 F.3d 359, 363 (3d Cir. 2012); see also Zahra v. Town of Southold, 48 F.3d 674, 684 (2d Cir. 1995) (recognizing that the mere fact that similarly situated parties are treated differently does not by itself establish an actionable selective enforcement claim). A federal constitutional violation does not exist merely because of the "exercise of some selectivity in enforcement." Oyler v. Boles, 368 U.S. 448, 456 (1962); see also Gardenhire v. Schubert, 205 F.3d 303, 319 (6th Cir. 2000) ("[T]here is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; the standard is a demanding one." (quoting Stemler v. City of Florence, 126 F.3d 856, 873 (6th Cir. 1997))).

Karns and Parker have proffered insufficient evidence to support a cognizable selective enforcement claim as a matter of law. Indeed, apart from their wholly generalized allegation that "selective enforcement of the law by a state officer is a violation of the constitution," Karns and Parker Br. 20, Karns and Parker point to no evidence that Officers Shanahan and Crowe treated similarly situated individuals differently. They do not even identify other individuals who might be similarly

26

situated.[10] Nor have Karns and Parker offered evidence of discriminatory purpose. This lack of record evidence compels us to conclude that the selective enforcement claim lacks merit. See, e.g., Jewish Home of E. Pa., 693 F.3d at 363 (affirming judgment as a matter of law on a selective enforcement claim when the plaintiff failed to show that it was treated differently from other similarly situated entities and did not show discriminatory purpose); Doninger v. Niehoff, 642 F.3d 334, 357 (2d Cir. 2011) (affirming summary judgment for the defendants when the plaintiff failed to produce any comparator evidence); Zahra, 48 F.3d at 684. Even without inquiring as to whether the right Karns and Parker identify here is clearly established, the failure to establish a factual basis for the purported constitutional violation is an independently sufficient ground on which to affirm the grant of summary judgment in favor of the individual officers. See, e.g., Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (holding that courts may affirm on either prong of the qualified

---

[10] The sole evidence that Karns and Parker proffer in support of this claim is the deposition testimony of two NJ Transit employees who are responsible for preparing and approving non-commercial speech permits. App. 559, 628. According to that testimony, political candidates are not required to obtain permits to speak on NJ Transit property. App. 559, 628. Karns and Parker have not, however, offered any factual detail as to the identities of the political candidates against whom the permit requirement was purportedly unenforced. Karns and Parker have also adduced no facts suggesting that Crowe and Shanahan were aware of such a purportedly discriminatory policy, much less involved in executing it with respect to the individual plaintiffs in this case.

27

immunity analysis).  Accordingly, the officers were entitled to qualified immunity and summary judgment was properly granted on the selective enforcement claim.

B.

We next address Karns's and Parker's retaliation claim. To establish unlawful retaliation under the First Amendment, a plaintiff must prove:  "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."  Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006) (citing Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003)).  Karns and Parker maintain that there was a genuine factual dispute as to whether their exercise of their First Amendment rights — namely, their protesting of the officers' demands and their attempt to make a video recording of the officers — caused their subsequent arrest, thus precluding the entry of summary judgment.  Karns and Parker Br. 19, 23.

Even assuming Karns and Parker could show sufficient facts supporting their retaliation claim, their claim fails on the "clearly established" prong of the qualified immunity analysis. Karns and Parker maintain that the law was clearly established that the First Amendment prohibits government officials from subjecting individuals to retaliation for their protected speech. Karns and Parker Br. 22–23.  This articulation of the relevant right, however, "put[s] the question of whether the 'clearly established' standard has been met at much too high a level of abstraction."  Zaloga v. Borough of Moosic, 841 F.3d 170, 175 (3d Cir. 2016); see also Wilson, 526 U.S. at 615; Sharp v.

28

Johnson, 669 F.3d 144, 159 (3d Cir. 2012). The proper inquiry, instead, is whether Karns and Parker had a "more specific right to be free from retaliatory arrest that is otherwise supported by probable cause." Zaloga, 841 F.3d at 175 (quoting Reichle v. Howards, 566 U.S. 658, 665 (2012)).

The Supreme Court's decision in Reichle, which was decided just weeks before Karns's and Parkers' arrests, conclusively disposes of this inquiry. The Court, on the facts of that case, held that "it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation." 566 U.S. at 670. As we discuss in the next section, ample probable cause supported the arrests of Karns and Parker. Given the state of the law at the relevant time period, it was therefore reasonable for the officers to believe that an arrest otherwise supported by probable cause would not violate Karns's and Parker's First Amendment rights. The District Court did not err in concluding that the officers were entitled to qualified immunity on the retaliation claim.

### C.

We turn to Karns's and Parker's claim alleging that the officers lacked probable cause to arrest them. As noted, the determination of whether there was sufficient probable cause to support Karns's and Parker's arrests is relevant both to their First Amendment retaliation claim and to their Fourth Amendment claim that the officers lacked a reasonably objective basis for their arrests.

Officers who "reasonably but mistakenly conclude that probable cause is present" are entitled to qualified immunity.

Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). We employ an objective test to determine whether an arrest is without probable cause, looking to "the facts available to the officers at the moment of arrest." Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994) (quoting Beck v. Ohio, 379 U.S. 89, 96 (1964)). Probable cause exists when "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." United States v. Cruz, 910 F.2d 1072, 1076 (3d Cir. 1990). Although the probable cause inquiry is usually a question for the jury, courts "may conclude in the appropriate case . . . that probable cause did exist as a matter of law if the evidence, viewed most favorably to [the p]laintiff, reasonably would not support a contrary factual finding." Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

We look to the elements of the offense to determine whether an arrest was supported by probable cause. See Wright, 409 F.3d at 602. Karns and Parker were first charged with trespass under N.J. Stat. Ann. § 2C:18-3(b). Under that statute, "[a] person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by . . . [a]ctual communication to the actor." N.J. Stat. Ann. § 2C:18-3(b). Generally, there will be "sufficient circumstantial evidence to constitute probable cause" when there is "information supporting a conclusion that the potential defendant in a trespass case was not licensed or privileged and that he was so advised by the custodian of the property." Paff v. Kaltenbach, 204 F.3d 425, 437 (3d Cir. 2000). This will "normally be true even where the potential

30

defendant, upon being confronted by a law enforcement officer, makes a claim of entitlement to be on the premises." Id.

The record in this case indicates that Parker knew that a permit was required to engage in speech at the station. App. 118, 244–45. Moreover, the officers affirmatively informed Karns and Parker of this requirement before requesting that they vacate the platform. Karns and Parker were, thus, well aware that they were not licensed to be on the train platform. Karns and Parker also led the officers to believe that they would remain on the platform despite knowing that they lacked the requisite permit. These facts amply support the officers' determination of probable cause that Karns and Parker were engaged in criminal trespass. See Paff, 204 F.3d at 437.

As a result, Officers Shanahan and Crowe were entitled to qualified immunity on their claim that the officers arrested them without probable cause.[11]

---

[11] We decline to address whether Karns's and Parker's failure to produce valid identification created probable cause for the obstruction offenses, N.J. Stat. Ann. § 2C:29-1(a), (b). The existence of probable cause as to the trespass offense is an independently adequate ground on which to affirm the award of qualified immunity to the officers on the Fourth Amendment claim. See Barna, 42 F.3d at 819 ("[A]s long as the officers had some reasonable basis to believe [the arrestee] had committed a crime, the arrest is justified as being based on probable cause. Probable cause need only exist as to any offense that could be charged under the circumstances." (emphasis added)).

31

D.

Turning finally to Karns's and Parker's "right to record" claim, it was not clearly established as of the date of Karns's and Parker's arrests that there was a First Amendment right to videotape police officers during an investigative stop. In Kelly v. Borough of Carlisle, 622 F.3d 248 (3d Cir. 2010), we concluded that there was "insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment." Id. at 262. In light of this precedent, it was not unreasonable for the officers to regard their conduct as lawful. Moreover, even if the instant case is distinguishable from Kelly on the basis that the encounter here was not a traffic stop, Karns and Parker have not offered a Circuit-level case supporting their position that the right to record was clearly established. See Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." (quoting al-Kidd, 563 U.S. at 744)).[12] The District Court

---

[12] In the intervening period since Karns's and Parker's arrests in 2012, our Court has held that "the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public." Fields v. City of Philadelphia, 862 F.3d 353, 356 (3d Cir. 2017). However, as in Fields itself, this right was not clearly established at the time of the challenged conduct. Id. at 362 ("[W]e cannot say that the state of the law at the time of our cases (2012 and 2013) gave fair warning so that every

32

therefore did not err in concluding that the officers were entitled to qualified immunity on the "right to record" claim.

V.

For the foregoing reasons, we will affirm the District Court's entry of summary judgment.

---

reasonable officer knew that, absent some sort of expressive intent, recording public police activity was constitutionally protected."). Accordingly, although the right identified by Karns and Parker is now clearly established in this Circuit, our qualified immunity analysis in this case remains unchanged. See Brosseau v. Haugen, 543 U.S. 194, 200 n.4 (2004) (observing that decisions "that postdate the conduct in question . . . are of no use in the clearly established inquiry" (citations omitted)).

ROTH, *Circuit Judge*, dissenting.

Were we writing on a blank slate, it would be within the prerogative of the Majority to decide this case as it does. But the slate is not blank. The precise question that we examine here, whether NJ Transit is an "arm of the state" entitled to Eleventh Amendment sovereign immunity," we have already fully considered and resolved *en banc* in *Fitchik v. N.J. Transit Rail Operations, Inc*.[1] Little has changed since we decided this question. Thus, stare decisis, principles of estoppel, and our own Internal Operating Procedures all require that we decline the invitation to overrule *Fitchik*. For this reason, I respectfully dissent from Part III of the majority opinion.

I.

The doctrine of stare decisis is simple: Like cases should be decided alike. We should not overturn our precedential opinions absent special justification. Adherence to stare decisis thereby "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals[.]"[2] Our effort to maintain a

---

[1] 873 F.2d 655 (3d Cir. 1989) (*en banc*).

[2] *United States v. Babich*, 785 F.2d 415, 417 (3d Cir. 1986) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 266 (1986)); *see also Payne v. Tennessee*, 501 U.S. 808, 827 (1991) ("Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.").

1

consistent and reliable body of jurisprudence is memorialized in our Internal Operating Procedures (I.O.P.), which state explicitly that "it is the tradition of this court that the holding of a panel in a precedential opinions is binding on subsequent panels."[3] *En banc* consideration by the full Court is required to overrule a prior precedential opinion.[4]

To be sure, there are exceptions to this rule. As the Majority notes, we may—even without the blessing of an *en banc* majority—depart from a precedential opinion when its holding is in conflict with intervening Supreme Court authority.[5] My colleagues permit New Jersey Transit and the Transit officers to wriggle through this loophole. They suggest that *Fitchik* is no longer binding in light of the Supreme Court's intervening decision in *Regents of the University of California*. The Majority then concludes that changes in the legal underpinnings of *Fitchik* justify overruling it. I disagree with both holdings.

## A. Intervening Legal Changes Do Not Require

### *Fitchik*'s Overruling

*Fitchik* explains the analytical framework that we use to determine whether a state entity, such as NJ Transit, is "an arm of the state," entitled to Eleventh Amendment immunity. *Fitchik* instructs us to employ a fact-intensive, three-factor balancing test. We consider the funding factor, the status

---

[3] 3d Cir. I.O.P. 9.1 (2015).

[4] 3d Cir. I.O.P. 9.1.

[5] *See* Maj. Op. 11-12; *Mennen Co. v. Atl. Mut. Ins. Co.*, 147 F.3d 287, 294 n.9 (3d Cir. 1998).

under state law factor, and the autonomy factor.[6] After making an individual determination as to whether each factor supports a finding for or against immunity, we balance them to decide whether an entity is an arm of the state.[7] After a thorough review of the facts as they pertain to each factor, the *Fitchik* Court held that NJ Transit is "not the alter ego of New Jersey [and] is not entitled to eleventh amendment immunity."[8]

*Fitchik* treats the funding factor as the most important.[9] We recently explained, however, that "[w]hile our jurisprudence had long afforded the first factor—state funding—more weight than the others, we recalibrated the factors in light of the Supreme Court's observation in *Regents of the University of California v. Doe* that an Eleventh Amendment inquiry should not be a 'formalistic question of ultimate financial liability.'"[10] Thus, "[w]e now treat all three *Fitchik* factors as 'co-equals,' with the funding factor breaking the tie in a close case."[11]

Even though *Fitchik* explicitly acknowledges that no single factor is determinative in its evaluation, the Majority believes that its treatment of the funding factor as the most important warrants a complete overruling of the opinion. But in *Fitchik*, we engaged in a qualitative assessment of each factor; we explicitly considered the degree to which each

---

[6] *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016).

[7] *Id.* at 84 (citing *Fitchik*, 873 F.2d at 664).

[8] *Fitchik*, 873 F.2d at 664.

[9] *Id.* at 659-60.

[10] *Maliandi*, 845 F.3d at 84 (internal citations omitted).

[11] *Id.* (internal citations omitted).

factor counseled in favor of or against immunity. Based on the record that was before us—which is largely unchanged today—we held that NJ Transit is not entitled to immunity because the funding factor "provides extremely strong indication that NJT is not the alter ego of New Jersey" while "[t]he other factors—NJT's treatment under state law, and its degree of autonomy—provide only weak support for the conclusion that NJT is New Jersey's alter ego."[12] Thus, *Fitchik* established that a showing of one factor can be strong enough to outweigh two factors that make weaker showings for the opposite outcome. Central to this holding was the idea that the strength of each factor must be qualitatively weighed.

Neither the Supreme Court's *Regents of the University of California* decision nor *Benn v. First Judicial Dist. of Pa.*'s pronouncement that the factors are now "co-equal"[13] undercuts this aspect of *Fitchik*. The Majority believes that *Regents of the University of California* requires courts to count the factors that favor or disfavor immunity, however slightly, and simply rule on the side of where two of the three factors lie. The "holistic analysis" compelled by *Regents of the University of California* does not require this formalistic approach, and our subsequent cases—including *Benn*—do not either. *Benn*, which explicitly considered *Regents of the University of California*, established only that no single *Fitchik* factor is "predominant" in our analysis.[14] Our cases have since understood that no factor is entitled to presumptive

---

[12] *Fitchik*, 873 F.2d at 664.

[13] *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 240 (3d Cir. 2005).

[14] *Cooper v. Se. PA Transp. Auth.*, 548 F.3d 296, 301 (3d Cir. 2008) (citing *Benn*, 426 F.3d at 240).

4

weight, and no factor is independently dispositive. This approach does not preclude *Fitchik*'s qualitative method, and we have not understood it to have done so.

The qualitative strength of each factor has consistently guided our analysis. *Febres v. Camden Board of Education*[15] is demonstrative. There we found that the autonomy factor "*slightly* favor[ed]" immunity while the other two factors—funding and status—counseled against immunity.[16] Ultimately, we declined to recognize any immunity.[17] In *Cooper v. Southeastern Pennsylvania Transit Authority*, we again declined to recognize Eleventh Amendment immunity because, unlike the state status factor—which weighed "slightly" in favor of immunity—the autonomy and state funding factors together weighed "slightly" against a finding of immunity.[18] Our consideration in *Bowers v. National Collegiate Athletic Association* also explicitly considered the qualitative strength of each *Fitchik* factor.[19] There we concluded that the university was an arm of the state because the state-treasury factor weighed only "slightly" against immunity and the status and autonomy factors weighed "heavily" in favor of it.[20] As demonstrated, the cases we have decided after *Regents of the University of California* and *Benn* do not merely rely on a mechanical counting of the factors. Instead, they explicitly assess the degree to which

---

[15] 445 F.3d 227 (3d Cir. 2006).

[16] *Id.* at 232, 237 (emphasis added).

[17] *Id*. at 237.

[18] 548 F.3d 296, 311 (3d Cir. 2008).

[19] 475 F.3d 524, 549-50 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007).

[20] *Id*.

5

each factor makes a showing. That is because *Fitchik* requires—and *Regents of the University of California* permits—us to do so.

The fact that in cases such as *Febres*, *Cooper*, and *Bowers*, our assessment of the factors has declined to recognize immunity when at least two *Fitchik* factors have cautioned against such a finding does not change our conclusion. Our post-*Regents of the University of California* cases have not considered a situation like the one we confronted in *Fitchik*—where one factor provides "extremely strong" support for one conclusion while the other two factors provide only "weak" support for the opposite outcome. Thus, those decisions are distinguishable and do not necessarily conflict with *Fitchik*. As a result, I do not believe that the circumstances here rise to the kind of exceptional circumstances we ordinarily require to warrant a departure from a precedential opinion absent *en banc* consideration. *Fitchik* can and should be read harmoniously with *Regents of the University of California* and our subsequent opinions. Only an *en banc* majority of our Court should decide whether the "strong indication" compelled by New Jersey Transit's funding can be overcome by the "weak support" of the "state law" and "autonomy" factors.

The Majority, however, fears that our continued application of *Fitchik* could generate "a potentially fractured body of jurisprudence."[21] Indeed, when two of our decisions are inconsistent, one of them must yield. But as I have explained, there is no inconsistency here. And even if there were, overruling *Fitchik* would be the improper course. We

---

[21] Maj. Op. 12.

have "long held that if [this Circuit's] cases conflict, the earlier is the controlling authority and the latter is ineffective as precedents."[22]  In light of *Fitchik*'s continuing validity, it remains the opinion that governs because it came first.  So, to the extent that our post-*Fitchik* precedents are inconsistent with *Fitchik* in ways not required by *Regents of the University of California*, they are without effect.[23]  *Fitchik* remains the controlling authority and, as a result, this panel is foreclosed from reconsidering the question re-presented here.

**B.      The Circumstances Have Not Changed So Significantly That Our      Reexamination Is Required**

Our Court has long recognized that principles of estoppel permit a litigant who was not a party to a prior judgment to use that judgment to prevent a defendant from

---

[22] *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008) (internal quotation marks and citation omitted); *see also United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009) ("In the unique circumstance when our panel decisions conflict and our Court has not spoken *en banc*, . . .the earlier decision is generally the controlling authority." (citation omitted))

[23] *Holland v. N.J. Dep't of Corrections*, 246 F.3d 267, 278 n.8 (3d Cir. 2001) ("[T]o the extent that [a case within the circuit] is read to be inconsistent with earlier case law, the earlier case law . . . controls."); *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 354 (3d Cir.1981) ("[A] panel of this court cannot overrule a prior panel precedent.  To the extent that [the later case] is inconsistent with [the earlier case, the later case] must be deemed without effect." (internal citation omitted)).

7

relitigating issues resolved in the earlier proceeding.[24] Relying on this recognition, Karns and Parker argue that NJ Transit is collaterally estopped from claiming that it is an arm of the state because *Fitchik* conclusively rejected that argument. They are right. The Majority, however, believes that our reconsideration is appropriate because legal developments over the past twenty-seven years have changed the weighing of the factors upon which *Fitchik* was based.[25] In its view, a re-balancing of the factors in light of these alleged new circumstances clearly weighs in favor of sovereign immunity. I disagree because the circumstances have remained largely unchanged.[26]

    *Fitchik* held that the first factor—"whether the judgment would be paid by state funds—provides an extremely strong indication that NJT is not the alter ego of New Jersey."[27] As the Majority observes, NJ Transit has "not offered updated financial information to undermine this assessment."[28] Thus, for the reasons my colleagues note, this factor continues to "provide[] extremely strong indication"

---

[24] *Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1232 (3d Cir. 1995) (citation omitted).

[25] Resp't's Br. 19; Maj. Op. 14-15 (contending that "[i]n the twenty-seven years since our Court's decision in *Fitchik*,. . . it has become much more apparent that New Jersey law regards NJ Transit as an arm of the state.").

[26] In addition, as we state in Part A above, the strength of each of the factors found in *Fitchik* was weighed qualitatively, a procedure which is consistent with the approach of the Court in *Regents of the University of California.*

[27] *Fitchik*, 873 F.2d at 664.

[28] Maj. Op. at 13.

that NJ Transit is not the entitled to Eleventh Amendment immunity.[29]

The second *Fitchik* factor requires us to consider "[t]he status of the agency under state law . . .."[30] In *Fitchik¸* we held that this factor "tilt[s] in favor of [the transit authority's] contention that [NJ Transit Rail Operations] is entitled to sovereign immunity, *but only slightly*."[31] The Majority contends that "in the intervening years since our decision in *Fitchik*, it has become apparent that the state law factor weighs heavily in favor of a finding of immunity."[32] I disagree.

My colleagues conclude that the state law factor now favors a finding of immunity because NJ Transit is statutorily constituted as an instrumentality of the State, constitutionally allocated within the Department of Transportation, vested with the authority to exercise police powers, considered state property under state tax laws, designated as an "alter ego of the State" by a state's trial and intermediate level courts, subject to the Administrative Procedures Act, and has the power of eminent domain.[33] This evidence might be more compelling had our Court not considered it when NJ Transit first raised its immunity defense in *Fitchik*. We explicitly recognized that "[t]here is some indication that New Jersey

---

[29] *Fitchik*, 873 F.2d at 664.
[30] *Id.* at 663.
[31] *Id.* (emphasis added).
[32] Maj. Op. 19.
[33] Maj. Op. 15-17.

9

law considers [NJ Transit] to be an arm of the state," [34] noting that

> [NJ Transit] is subject to New Jersey Tort Claims Act; is immune from state property tax; has the power of eminent domain; and is subject to the strictures of the state administrative procedure act. Further, the New Jersey Supreme Court has declared [NJ Transit] to be a "public" entity, although not in the context of sovereign immunity.[35]

Thus, NJ Transit's allocation under the state constitution and the fact that it possesses official police powers are the only facts set forth here that we did not explicitly consider in *Fitchik*. I doubt that these facts are so significant that they warrant a new determination by this panel. NJ Transit offers the fact of the constitution's treatment of the transit body to show that New Jersey deems it an instrumentality of the State exercising essential governmental functions. But *Fitchik* fully appreciated that, under state law, NJ Transit seems to be an arm of the state.[36] That fact, however, was not conclusive.[37] I also doubt that the grant of official police powers to NJ Transit alone requires a change in our *Fitchik*

---

[34] *Fitchik*, 873 F.2d at 662.

[35] *Id.* at 662-663 (citations omitted).

[36] *Id.* at 662 ("There is some indication that New Jersey law considers [NJ Transit] to be an arm of the state.").

[37] *Id.* at 663 ("On the other side of the equation, New Jersey has given power to NJT in two spheres that *Urbano* identified as indicative that an agency is not entitled to sovereign immunity.").

holding.[38]  In light of the foregoing, I cannot conclude that NJ Transit has presented new evidence requiring us to hold that the second *Fitchik* factor now "strongly favors a finding of immunity."[39]

Under the third factor, we consider the degree of autonomy the entity has from the State.[40]  Weighing the pertinent facts—which have not since changed in any meaningful way—the *Fitchik* Court concluded that although NJ Transit is "significantly autonomous," the final *Fitchik* factor "counsels slightly in favor of according immunity."[41] That is principally because "the degree of control by the governor is fairly substantial . . .."[42]  The Majority's "consideration of this factor is largely in accord," and thus does not suggest that new circumstances with respect to this factor warrant our reexamination.[43]

NJ Transit suggests that there are additional considerations that compel us to conclude that the factor here "weighs heavily in finding immunity."[44]  Their argument is based on the fact that (1) NJ Transit's board must present its annual budget to the governor and legislature, (2) the New

---

[38] NJ Transit does not suggest that its enforcement officers did not have general police authority at the time *Fitchik* was decided.  Indeed, the statutory provision granting New Jersey Transit officers general police powers appears to have been passed in 1989, well before *Fitchik*.

[39] Maj. Op. 17.

[40] *Fitchik,* 873 F.2d at 659.

[41] *Id.* at 664.

[42] *Id.*

[43] Maj. Op. 18.

[44] Resp't's Br. 27.

11

Jersey governor appoints the entire board, and (3) the transit system's acquisition of privately owned transportation entities are subject to legislative veto. These arguments were all made in *Fitchik*'s dissenting opinion.[45] Because the *Fitchik* majority considered them and remained unpersuaded, we are bound by its conclusion. Accordingly, this factor continues to only "counsel slightly in favor of according immunity to NJT" in light of *Fitchik*.[46]

As demonstrated, NJ Transit's funding scheme, status under state law, and organizational structure have remained largely unchanged over the last twenty-seven years. NJ Transit's arguments here were fully considered and resolved in *Fitchik*; as a result, principles of collateral estoppel preclude NJ Transit from relitigating them here.

## III.

In light of the principles underlying the doctrines of stare decisis and collateral estoppel, it has been the tradition of this court to refrain from overturning our precedents "lightly."[47] Today we depart from that tradition. Because I believe we do so unjustifiably, I respectfully dissent.

---

[45] *Fitchik*, 873 F.2d at 667-68 (Rosenn, J., dissenting)

[46] *Id*. at 664.

[47] *Al-Sharif v. U.S. Citizenship & Immigration Servs.*, 734 F.3d 207, 212 (3d Cir. 2013).